BINDCZYCK *v.* FINUCANE, CHAIRMAN OF THE
BOARD OF IMMIGRATION APPEALS, ET AL.

No. 18.   Argued October 10, 1951.—Decided November 26, 1951.

*Joseph A. Fanelli* argued the cause and filed a brief for petitioner.

*James L. Morrisson* argued the cause for respondents. With him on the brief were *Solicitor General Perlman, Assistant Attorney General McInerney, Beatrice Rosenberg* and *Edward S. Szukelewicz.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

On December 2, 1943, the Circuit Court of Frederick County, Maryland, issued a certificate of naturalization to petitioner after proceedings that conformed with the requirements of the Nationality Act of 1940. 54 Stat. 1137, 8 U. S. C. § 501 ff. Seven days later, and at the same term of court, the Government moved to vacate and set aside the order of naturalization, claiming on evidence outside the record that it was obtained by fraud and that therefore the citizenship was illegally procured.

It is admitted that the requirements of § 338 of the Nationality Act, wherein Congress made specific provision for "revoking . . . the order admitting . . . to citizenship . . . on the ground of fraud or on the ground that such order . . . [was] illegally procured," [1] were not

---

[1] 54 Stat. 1137, 1158, 8 U. S. C. § 738. The pertinent portions of the section are:

"(a) It shall be the duty of the United States district attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 301 in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground of fraud or on the ground that such order and certificate of naturalization were illegally procured.

"(b) The party to whom was granted the naturalization alleged to have been fraudulently or illegally procured shall, in any such proceedings under subsection (a) of this section, have sixty days' personal notice in which to make answer to the petition of the

followed. Instead, the Maryland court exercised its general power under Maryland law to set aside judgments during the term of court in which they were rendered.[2]

We brought this case here to determine whether the requirements of § 338 control the revocation of citizenship on the ground of fraud or on the ground that it was illegally procured; or whether the grant of citizenship by the courts of the forty-eight States is subject to whatever summary control State courts may have over their merely local judgments. The questions are of obvious importance in the administration of the naturalization laws, apart from the conflict between the views of the court below and those of the Court of Appeals for the Seventh Circuit in *United States ex rel. Volpe* v. *Jordan,* 161 F. 2d 390.

The issue was raised by petitioner's action in the District Court for the District of Columbia for a judgment declaring him to be a citizen of the United States and for an order restraining respondents from deporting him. Upon a motion by the Government to dismiss the complaint, petitioner moved for summary judgment which was granted by the District Court, declaring petitioner "to be a national and citizen of the United States" but "without prejudice to the government's right to institute appropriate proceedings for denaturalization under Sec. 338 of the Nationality Act of 1940." The Court of Appeals reversed, 87 U. S. App. D. C. 137, 184 F. 2d 225, and we granted certiorari. 341 U. S. 919.

---

United States; and if such naturalized person be absent from the United States or from the judicial district in which such person last had his residence, such notice shall be given by publication in the manner provided for the service of summons by publication or upon absentees by the laws of the State or the place where such suit is brought."

[2] See *Eddy* v. *Summers,* 183 Md. 683, 687, 39 A. 2d 812, 814 (1944).

Due regard for § 338, including the history of its origin, and for the nature of a judgment of naturalization, together with a consideration of the conflicting and capricious diversities of local law affecting the finality of local judgments, compel us to hold that § 338 is the exclusive procedure for canceling citizenship on the score of fraudulent or illegal procurement based on evidence outside the record.

Section 338 of the Nationality Act of 1940 is for our purpose the reenactment of § 15 of the Act of June 29, 1906, 34 Stat. 596, 601. That Act was the culmination of half a century's agitation directed at naturalization frauds, particularly in their bearing upon the suffrage.[3] On the basis of a nationwide survey to determine the incidence and causes of naturalization frauds with a view to devising recommendations for corrective legislation, Pres-

---

[3] As early as 1844, a Senate resolution called for an inquiry into these frauds and into the possibility of a judicial procedure for canceling fraudulent naturalization certificates. S. J., 28th Cong., 2d Sess. 40, 44. For a summary of pre-Civil War legislative activity in regard to naturalization see Franklin, The Legislative History of Naturalization in the United States. Annual messages of the Presidents, from Grant onward, urged remedial legislation. Richardson, Messages and Papers of the Presidents: Grant, 1st Annual Message, 1869, 6th Annual Message, 1874, 7th Annual Message, 1875, 8th Annual Message, 1876; Arthur, 4th Annual Message, 1884; Cleveland, 1st Annual Message, 1885, 2d Annual Message, 1886, 4th Annual Message, 1888; Harrison, 1st Annual Message, 1889, 2d Annual Message, 1890; Roosevelt, 3d Annual Message, 1903, 4th Annual Message, 1904, 5th Annual Message, 1905. Grant and Cleveland asserted specifically that there was no way for the Government to obtain a revocation of fraudulently acquired citizenship and asked for correction of this deficiency. Id., Grant, 6th Annual Message, 1874; Cleveland, 1st Annual Message, 1885. But Harrison called attention to a "new application of a familiar equity jurisdiction" whereby over a hundred naturalization orders had been vacated at the instance of the Attorney General by the United States Circuit Courts in original equity suits. As he saw it, the urgent remaining need was

ident Theodore Roosevelt's Commission on Naturalization prepared a report which was the foundation of the Act of 1906. H. R. Doc. No. 46, 59th Cong., 1st Sess. This report, the hearings before congressional committees and their reports, the floor debates on the proposed measure, leave no doubt that the target of legislation was fraudulent naturalization.[4] It is equally clear that the remedy for the disclosed evil lay in the effective exercise of the power of Congress "To establish an uniform Rule of Naturalization." U. S. Const., Art. I, § 8, cl. 4.

To prevent fraud in a proceeding before a naturalization court, the Act devised a scheme of administrative oversight for the naturalization process. The Government was given the right to appear. § 11. 34 Stat. 596, 599. This right was fortified by requiring notice of the petition to the newly created Bureau of Immigration and Naturalization and a ninety-day waiting period between the filing of the petition and the final hearing. §§ 6 and 12, 34 Stat. 596, 598 and 599. These were safeguards to enable verification by the Bureau of the

---

for an adequate prenaturalization investigation. *Id.*, Harrison, 2d Annual Message, 1890.

In 1903, a federal grand jury investigated and a Special Assistant United States Attorney was charged with prosecution of naturalization frauds in New York City. See Rep. Atty. Gen. v, 392 (1903); H. R. Doc. No. 46, 59th Cong., 1st Sess. 76. A special examiner for the Department of Justice made a nationwide investigation, a report of which was transmitted to Congress. See Rep. Atty. Gen. 393 (1903). See generally Roche, Pre-Statutory Denaturalization, 35 Cornell L. Q. 120.

[4] See, *e. g.*, H. R. Doc. No. 46, 59th Cong., 1st Sess. 11–15, 20–23, 76–78, 79–92; Hearings before the House Committee on Immigration and Naturalization on the Bills to Establish a Bureau of Naturalization, and to Provide for a Uniform Rule for the Naturalization of Aliens Throughout the United States, 59th Cong., 1st Sess. 3–54; H. R. Rep. No. 1789, 59th Cong., 1st Sess. 2; S. Rep. No. 4373, 59th Cong., 1st Sess. 2; 40 Cong. Rec. 3640 ff.

facts alleged in the petition and investigation of the qualifications of the applicant for citizenship.[5] By these provisions Congress recognized that enforcement is the heart of the law.

But Congress was not content to devise measures against fraud in procuring naturalization only. In § 15 of the Act of 1906 it formulated a carefully safeguarded method for denaturalization. Though the principal criticism leading to the enactment concerned the evils inherent in widely diverse naturalization procedures, experience was not wanting of the dangers and hardships

---

[5] These provisions were suggested by the special Commission on Naturalization. See H. R. Doc. No. 46, 59th Cong., 1st Sess. 17, 99. In his Second Annual Message, President Harrison had recommended a waiting period for investigation. See Richardson, Messages and Papers of the Presidents, Harrison, 2d Annual Message, 1890. See also Rep. Atty. Gen. 397 (1903) for a similar suggestion from the Special Examiner in Relation to Naturalization.

No section of the Act was more thoroughly debated than this one. Three separate amendments to reduce the waiting period were rejected. 40 Cong. Rec. 7762–7770. The period was cut to thirty days in the Nationality Act of 1940, 54 Stat. 1137, 1156, 8 U. S. C. § 734 (c). But the codifiers reiterated that the purpose of the delay was to permit the Government "to make further inquiry as to the eligibility of the applicant and the competency of his witnesses." Hearings before the House Committee on Immigration and Naturalization on H. R. 6127, superseded by H. R. 9980, 76th Cong., 1st Sess. 466.

The opportunity for investigation provided by these sections was taken full advantage of by the Bureau. See H. R. Rep. No. 1328, 69th Cong., 1st Sess. 1. Indeed, in 1926, the investigations were made a formal part of the naturalization process in the federal courts by permitting officers of the Bureau to conduct the examination of the applicant's witnesses prior to final hearing on the petition and authorizing the naturalization judge to forego such examination on final hearings if the recommendation of the Bureau was favorable. 44 Stat. 709. This procedure was extended to state naturalization courts as well in 1940. 54 Stat. 1137, 1156, 8 U. S. C. § 733.

attendant on haphazard denaturalization. Information was before Congress that ever since 1890 the then circuit courts had vacated naturalization orders at the suit of the Attorney General,[6] although when the validity of § 15 was before it, this Court left open the question whether a court of equity had such power without express legislative authority. *Johannessen* v. *United States,* 225 U. S. 227, 240. But the revocation of citizenship before 1906 was not always surrounded by the safeguards of an original equity proceeding. See, *e. g., Tinn* v. *United States District Attorney,* 148 Cal. 773, 84 P. 152 (1906).[7] Indeed, the history of the Act of 1906 makes clear that elections could be influenced by irregular denaturalizations as well as by fraudulent naturalizations. The only instance in the extensive legislative materials of vacation of naturalization orders by what appears to have been the procedure urged by the Government in this case involved just such a situation. A judge who had naturalized seven aliens on the supposition that they were members of his own political party promptly vacated

---

[6] See Richardson, Messages and Papers of the Presidents, Harrison, 2d Annual Message, 1890. 1,916 fraudulently obtained naturalization certificates were canceled in civil proceedings in New York City in the two-year period to May 29, 1905. H. R. Doc. No. 46, 59th Cong., 1st Sess. 76; H. R. Rep. No. 1789, 59th Cong., 1st Sess. 2.

[7] In that case, nine citizenship orders were revoked in an *ex parte* proceeding on oral motion of the United States District Attorney, purporting to be made as in the course of the original proceedings, over three years after the orders admitting to citizenship. This action was, however, reversed on appeal. See also 40 Cong. Rec. 7045 where it is stated that upon the announcement by the United States District Attorney in San Francisco that immunity from prosecution would be given to any holder of a fraudulently acquired certificate who surrendered it for cancellation, 204 certificates were turned in in the first thirty days.

his order when this supposition was corrected. See Rep. Atty. Gon. 394 (1903).[8]

Significantly, floor action on § 15 in the House reveals a specific purpose to deprive the naturalizing court as such of power to revoke. The original bill authorized United States attorneys to institute revocation proceedings in the court issuing the certificate as well as in a court having jurisdiction to naturalize in the district of the naturalized citizen's residence. H. R. 15442, 59th Cong., 1st Sess., § 17. A committee amendment adopted just before final passage put the section in the form in which it was enacted. That amendment, in the words of Congressman Bonynge, the manager of the bill, "takes away the right to institute [a revocation proceeding] in the court out of which the certificate of citizenship may have been issued, unless the alien happens to reside within the jurisdiction of that court." 40 Cong. Rec. 7874.

In the light of this legislative history we cannot escape the conclusion that in its detailed provisions for revoking a naturalization because of fraud or illegal procurement not appearing on the face of the record, Congress formulated a self-contained, exclusive procedure. With a view to protecting the Government against fraud while safeguarding citizenship from abrogation except by a clearly defined procedure, Congress insisted on the detailed, explicit provisions of § 15. To find that at the same time it left the same result to be achieved by the confused and conflicting medley, as we shall see, of State procedures for setting aside local judgments is to read congressional enactment without respect for reason.

---

[8] Objections were raised, on similar grounds, to the section in the original bill providing for appeal from naturalization orders and requiring a stay of the issuance of the certificate pending appeal. It was argued that a partisan district attorney might influence a close election by judiciously choosing the cases in which to appeal and obtain the stay. 40 Cong. Rec. 7786.

84

Between them, these two sections, § 11 and § 15, provided a complete and exclusive framework for safeguarding citizenship against unqualified applicants. Under the first, the Government was given ample opportunity to interpose objections prior to the order of naturalization. If proper account was not taken of the evidence, the Government had recourse to appeal for examination of the action of the naturalizing court on the record. *Tutun* v. *United States,* 270 U. S. 568. Congress, however, thought that ninety days was quite enough time for the Government to develop its case—indeed many members deemed it too long. 40 Cong. Rec. 7766–7770. At the expiration of that time, if citizenship was granted, it was to be proof against attacks for fraud or illegal procurement based on evidence outside the record, except through the proceedings prescribed in § 15. The congressional scheme, providing carefully for the representation of the Government's interest before the grant of citizenship and a detailed, safeguarded procedure for attacking the decree on evidence of fraud outside the record,[9] covers the whole ground. Every national interest is thereby protected.

Neither uncontested practice nor adjudication by lower courts has rendered a verdict which is disregarded by our construction of § 338. Nor as a rule for future conduct is any burden thereby placed on the Government in setting

---

[9] It deserves emphasis that we are dealing here with the revocation of naturalization "on the ground of fraud or on the ground that . . . [the naturalization was] illegally procured," to be established outside the record. We have not before us, and therefore do not decide, the power of a State court to control its naturalization judgment to the extent of correcting some clerical error.

And, of course, the present case does not touch situations where under State law a judgment does not come into being until a defined period or event after a decision is rendered. Compare *Commissioner* v. *Estate of Bedford,* 325 U. S. 283, 284–288.

aside a naturalization order where it can prove illegality or fraud.

An abstract syllogism is pressed against this natural, because rational, treatment of § 338 as the exclusive and safeguarding procedure for voiding naturalizations granted after compliance with the careful formalities of § 334.[10]  Grant of citizenship is a judgment; a judgment is within the control of the issuing court during the court's term; therefore naturalization is subject to revocation for fraud or illegal procurement during the term of the court that granted it.  So runs the argument.  Such abstract reasoning is mechanical jurisprudence in its most glittering form.  It disregards all those decisive considerations by which a provision like § 338 derives the meaning of life from the context of its generating forces and its purposes.  It also disregards the capricious and haphazard results that would flow from applying such an empty syllogism to the actualities of judicial administration.

By giving State courts jurisdiction in naturalization cases, Congress empowered some thousand State court judges to adjudicate citizenship.  If the requirements specifically defined in § 338 for revocation of citizenship were to be supplemented by State law regarding control over judgments by way of the "term rule" or otherwise, the retention of citizenship would be contingent upon application of myriad discordant rules by a thousand judges scattered over the land.

Wide and whimsical diversities are revealed by the local law of the forty-eight States in the power of their courts to set aside local judgments.[11]  The courts of some States have no power to set aside their own judgments; courts

[10] 54 Stat. 1137, 1156, 8 U. S. C. § 734.

[11] The conflicting varieties of State rules for vacating judgments are illustratively summarized in an Appendix, *post,* p. 88.

in other States have almost unlimited power. Not only is there this great diversity among the States. There are capricious differences within individual States. That Congress, composed largely of lawyers, should have gone through the process of the elaborate definition in § 338 but impliedly also allowed denaturalization through the eccentricities and accidents of variegated State practice, is an assumption that ought to have a solider foundation than an abstract syllogism. Without more, we cannot believe that Congress would subject a naturalized citizen—who has achieved that status only by the protecting formalities of the Nationality Act—to such unpredictable attack.[12]

Finally, it is suggested that since § 15 was found not to prevent the taking of appeals from a naturalization order, *Tutun* v. *United States, supra,* and since there are diversities in the time for appeal among State courts with power to naturalize, the diversities among State courts in the power to vacate their own judgments ought not to require resort to § 338 as the exclusive, uniform procedure for denaturalization.

One answer is that the Act of 1906 and its successor, the Nationality Act of 1940, had no provision whatever as to appellate review of errors appearing of record in a naturalization court. On the other hand, Congress laboriously dealt with the revocation of naturalization

---

[12] That Congress was not inattentive to existing variations in State practice, where it wished to absorb them, is shown by the last portion of § 338 (b) which reads:

". . . and if such naturalized person be absent from the United States or from the judicial district in which such person last had his residence, such notice shall be given by publication in the manner provided for the service of summons by publication or upon absentees *by the laws of the State or the place where such suit is brought.*" (Emphasis added.)

obtained by fraud or otherwise illegally. And since appellate review is so ingrained a part of American justice, this Court in the *Tutun* case naturally held that it was not to be assumed that Congress denied the right of appeal merely because it did not affirmatively confer it. Of course there are differences among State judiciaries as to the time within which an appeal can be taken. But the differences are within a narrow and unimportant range [13] compared with the enormous and quixotic differences relating to a court's control over its judgments on the score of fraud or illegality. It is one thing to allow some play for the joints in a statutory scheme like the Nationality Act, enforceable by both State and federal courts. It is quite another to inject a wholly dislocating factor by incorporating the diverse State rules for vacating judgments into the revocation process, which Congress specifically and comprehensively dealt with in § 338.

Congressional concern for uniformity in post-naturalization proceedings was shown in this very connection. The bill before Congress in 1906 provided for a uniform mode of appeal to the United States Circuit Courts of Appeals from naturalization judgments rendered by State, as well as federal, courts. H. R. 15442, 59th Cong., 1st Sess., § 13. Constitutional doubts and the practical problems which such an anomalous procedure would raise led to the omission of this section, leaving appeal procedure to the States. 40 Cong. Rec. 7784–7787. It is not to be supposed, however, that where, as with denaturalization, such doubts and anomalies were not present, Congress

---

[13] Vagaries among the States as to time for appeals are not substantial. The times for appeal fixed by States range principally from thirty days to three months. See Pound, Appellate Procedure in Civil Cases, 340–342.

would gratuitously abandon the constitutional mandate to establish "an uniform Rule of Naturalization." It established such a rule in § 338.

Accordingly, the judgment below must be reversed and that of the District Court reinstated.

*It is so ordered.*

MR. JUSTICE CLARK and MR. JUSTICE MINTON took no part in the consideration or decision of this case.

[For dissenting opinion of MR. JUSTICE REED, joined by MR. JUSTICE BURTON, see *post*, p. 92.]

## APPENDIX.

### POWER OF STATE COURTS TO VACATE THEIR OWN JUDGMENTS [1]

The diversities in State rules governing the power to vacate judgments are illustrated by the following:

(1) The common law rule, still followed by many States, including Maryland, is that for the duration of the term in which the judgment is entered the court may en-

---

[1] It is hardly necessary to note that the best effort to secure fastidious accuracy and currency in such matters as the local rules here summarized cannot assure them. The interpretation of local law, especially as to practice, is treacherous business for an outsider. The very uncertainty of the local rules makes it all the more unlikely that Congress intended to subject citizenship by naturalization to such attack.

Of course only State courts with power to naturalize, that is, "having a seal, a clerk, and jurisdiction in actions at law or equity, or law and equity, in which the amount in controversy is unlimited," 54 Stat. 1137, 1140, 8 U. S. C. § 701 (a), are here canvassed.

A great many States provide procedures—statutory or common law—for vacating judgments by a separate proceeding in the nature

tertain a motion to change it.[2]   This "term rule" inevitably would produce erratic results as to naturalization:[3]

(a) States differ very substantially in the length of court terms set by legislature or court.   See 3 Martindale-Hubbell Law Directory, "Court Calendars" (1951).   For example, in several counties of Kentucky the Circuit Court holds terms of only six *days'* duration; in contrast, the terms of the Oklahoma District Courts are six *months* in length.

(b) Even within a State the length of terms may vary greatly.   Consider Indiana, for example. The Marion County (Indianapolis) Superior Court has monthly terms; some judges of the Lake County Superior Court hold terms lasting for six months.[4]

(c) In a good many States the length of term may fluctuate with the amount of business that happens

---

of an equity suit.   See, *e. g.*, Kan. Gen. Stat., 1949, § 60–3007 *et seq.* The Government in this case does not argue that these collateral procedures are available in the face of § 338.   But it is not obvious why the argument of implied State control over a State judgment is not also relevant as to these State methods for controlling judgments.

[2] The medieval idea of dividing the calendar year for judicial purposes into terms and vacations developed from the necessities of sowing and harvesting, and from the demands of the Church for religious peace at certain seasons of the year.   See 1 Reeves, History of English Law, 191–192; 3 Holdsworth, A History of English Law, 674–675.

[3] The States used as illustration under this division (1) are only those which, as far as investigation discloses, follow the common law "term rule."

[4] Texas provides striking illustrations of diversity within a single State.   The Texas District Courts vary greatly from county to county in the number of terms per year and in the specified length of the terms; many District Courts are in continuous session, others

to be before the court, and with the untrammelled discretion of a judge in adjourning *sine die*. Unless adjourned *sine die* or concluded by the terminal date set by statute, a term, in general, ends only at the commencement of the next succeeding term held at the same place. See, *e. g.*, *Comes* v. *Comes*, 190 Iowa 547, 178 N. W. 403 (1920); *Hensley* v. *State*, 53 Okla. Cr. 22, 3 P. 2d 211 (1931). Thus, a term may be less than a day in length, or it might be a full year where the court has only one prescribed term annually.

(d) There is an inherent uncertainty in the "term rule." Consider a court with a prescribed or permitted term of ten months. *E. g.*, Rhode Island Superior Court in Providence, R. I. Gen. Laws, 1938, c. 498, § 2. A citizenship obtained by naturalization on the first day of the term might be vacated at any time within 10 months—under the reasoning of the Government; whereas the alien fortunate enough to be naturalized on the last day of the term would have citizenship indefeasibly except by the safeguarded procedure of § 338.

(2) A number of States have statutes similar to that of Alabama reading: "The circuit courts . . . shall be open for the transaction of any and all business, or judicial proceedings of every kind, at all times." Ala. Code, 1940, Tit. 13, § 114. In those States wide disparity in the time within which a judgment may be vacated is introduced by the following circumstances:

---

sit "till finished," and others have fixed terms of 3, 4, 6, 8 or 10 weeks. The judgments of certain District Courts with terms of 3 months or longer become "as final . . . 30 days after the date of judgment . . . as if the term of court had expired." Vernon's Tex. Civ. Stat., 1926, Art. 2092 (30); *Joy* v. *Young*, 194 S. W. 2d 159 (Tex. Civ. App. 1946).

(a) Some of these States provide by statute that a court has control of its judgments and may vacate them within some fixed time; the times vary greatly:

*One year:*

    Minnesota—Minn. Stat., 1949, § 544.32.

*60 days:*

    Kentucky (courts in continuous session)—Ky. Rev. Stat., 1946, § 451.130 (1).

*30 days:*

    Alabama—Ala. Code, 1940, Tit. 13, § 119.

    Illinois—Ill. Rev. Stat., 1949, c. 77, § 82.

    Maryland (Baltimore City Court)—See *Harvey v. Slacum,* 181 Md. 206, 29 A. 2d 276 (1942).

    New Mexico—N. M. Stat., 1941, § 19–901.

(b) Other States provide that only the motion for setting aside the judgment need be filed within a fixed period; the length of these periods also varies considerably:

*"A reasonable time not exceeding six months:"*

    Arizona—Ariz. Code Ann., 1939, § 21–1502.

    California—Deering's Cal. Code Civ. Proc., 1949, § 473.

*6 months:*

    Nevada—See *Lauer v. Eighth Judicial District Court,* 62 Nev. 78, 140 P. 2d 953 (1943).

(c) At any rate either the fixed period or the reasonable time for vacating judgments produces quite different results from the erratic consequences of the "term rule."

(3) In some States, it appears, a court has no control over its judgments after they are signed and entered. See, *e. g., Louisiana Bank v. Hampton,* 4 Mart. 94 (La. 1816); *Nelson & Co. v. Rocquet & Co.,* 123 La. 91, 48 So. 756 (1909). In Massachusetts a court has no jurisdiction

to vacate a judgment "on mere motion" except for clerical error. Shawmut Commercial Paper Co. v. Cram, 212 Mass. 108, 98 N. E. 696 (1912). But see Mass. Gen. Laws, 1932, c. 250, §§ 14–20.

MR. JUSTICE REED, with whom MR. JUSTICE BURTON joins, dissenting.

Upon filing of his petition for naturalization, an order and a certificate of naturalization were issued immediately by the Circuit Court of Frederick County, Maryland, on December 2, 1943, to petitioner Bindczyck, a soldier in the United States Army. Nationality Act of 1940, § 324, 54 Stat. 1149. On the next day he disclaimed loyalty to the United States and stated his desire to leave the country after the war.

Seven days after the naturalization and within the same term of the circuit court, the United States filed in the naturalization proceeding a motion to vacate and set aside the order of naturalization on the ground that newly discovered evidence showed Bindczyck swore falsely concerning his loyalty toward the United States and its defense. Bindczyck in open court admitted the charge. Thereupon the Maryland court directed that the order of citizenship be vacated, the certificate of naturalization voided, and the case restored to the pending calendar for immediate hearing. The record shows no further proceedings in Maryland, either by further hearing or by appeal.

On June 15, 1948, while he was in custody for deportation, Bindczyck filed a complaint in the District Court for the District of Columbia praying a declaration that he was a citizen of the United States. This was based on the contention that the order vacating his admission to citizenship was void because it had been issued without compliance with § 338 of the Nationality Act of 1940, set out in note 1 of the Court's opinion, ante, p. 77.

The Court upholds Bindczyck's contention. By that judgment the Court in a collateral proceeding determines that the vacation by the Maryland court of its order and the cancellation by that court of the certificate of naturalization are void because the proceedings were not taken in accordance with the above-mentioned § 338. That is, a state court with the alien before it has no power so to act, although it had jurisdiction to hear his application and enter an order for his naturalization. § 301.

The Court's judgment, we think, flows from its disregard of a postulate of statutory construction. This important principle is that new legislation is to be construed in the setting of existing law and practice.[1] Since sound methods of statutory interpretation are important in the administration of justice, it seems worthwhile to state the reasons for disagreement. A dissent may help to avoid another and further departure from normal statutory interpretation.

Even the most comprehensive legislation cannot be considered as though it were the entire body of the law. The continuation of courts and practices is assumed. Congress may give concurrent jurisdiction over federal matters to both state and federal courts. Of course, the jurisdiction of federal courts over federal matters may be made exclusive of all other tribunals by Congress.[2] That body may also, we assume, put limits on state court powers concerning federal rights. When Congress grants concurrent jurisdiction over federal matters, however, such a grant of power is to be exercised in accordance with the normal practices and procedure of the respective

---

[1] See *United States* v. *Sanges*, 144 U. S. 310, 311; Crawford, Statutory Construction (1940), c. XXII; 1 Bishop on Criminal Law (9th ed., Zane & Zollman, 1923) § 291b. Cf. *Stark* v. *Wickard*, 321 U. S. 288, 309; *Burnet* v. *Harmel*, 287 U. S. 103, 108.

[2] For examples, see 28 U. S. C. §§ 1333, 1334, 1338 (a), 1351, 1355, and 1356.

courts unless specifically or by necessary implication the federal legislation requires such limitation.[3]

We have had provisions for naturalization since March 26, 1790.[4] They have grown in complexity through the years. Under the Act of 1906, as shown by the Court's opinion, the Congress sought to remedy the evils of fraudulent naturalization and to protect the new citizen against cancellation of his certificate in an inconvenient forum or without proper notice. This purpose has been carried out in the present 1940 Act practically by the same words, so far as the sections here involved are concerned. Power over naturalization has remained in both state and federal courts of general jurisdiction.[5]

There is not a suggestion in the acts or in the legislative history that, by the enactment of § 15 of the earlier Act

---

[3] This principle was adverted to in the *Second Employers' Liability Cases*, 223 U. S. 1, 56, in these words:

"Because of some general observations in the opinion of the Supreme Court of Errors, and to the end that the remaining ground of decision advanced therein may be more accurately understood, we deem it well to observe that there is not here involved any attempt by Congress to enlarge or regulate the jurisdiction of state courts or to control or affect their modes of procedure, but only a question of the duty of such a court, when its ordinary jurisdiction as prescribed by local laws is appropriate to the occasion and is invoked in conformity with those laws, to take cognizance of an action to enforce a right of civil recovery arising under the act of Congress and susceptible of adjudication according to the prevailing rules of procedure."

[4] Act of March 26, 1790, 1 Stat. 103. See Statutory History of Naturalization in the United States, Report of Secretary of State, January 19, 1904, appended to Report to the President of the Commission on Naturalization, H. R. Doc. No. 46, 59th Cong., 1st Sess., p. 58.

[5] Act to Establish a Bureau of Immigration and Naturalization, 34 Stat. 596, §§ 3 and 15; Nationality Act of 1940, 54 Stat. 1137, §§ 301 and 338.

or § 338 of the present Act, the Congress intended to affect the power which state and federal courts have to grant new trials or rehearings or to set aside orders during a term or within such other limited time as statute or practice may prescribe. Section 338 in providing a method for "revoking and setting aside" the order and "canceling the certificate" of naturalization refers to the method of overturning a judgment of naturalization after the judicial procedure required for the grant is at an end. Section 338, in our view, covers only those new cases where circumstances call for the Government, in the words of the section "to institute proceedings in any court specified in subsection (a) of section 301 [54 Stat. 1140] in the judicial district in which the naturalized citizen may reside at the time of bringing suit." Under subsection (b) of § 338 the defendant is to "make answer to the petition of the United States." This language is aimed at new litigation, not at steps in a pending case.[6] Action on judgments during term time is a step in a pending case.[7]

The certificate of naturalization, as evidence of citizenship, is issued when the judge signs the order. 8 CFR (1949 ed.) § 377.1. A successful appeal by the Government from an order of naturalization would result in can-

---

[6] See *Johannessen* v. *United States*, 225 U. S. 227, 236:

"It does not follow that Congress may not authorize a direct attack upon certificates of citizenship in an independent proceeding such as is authorized by § 15 of the act of 1906." Compare also *United States* v. *Ness*, 245 U. S. 319, 326, where the Court speaks of § 15 as affording a remedy by "independent suit."

[7] "Knowing that the court had full power during the term to vacate its own decree, he took these leases subject to the possibility of such vacating of the decree." *Henderson* v. *Carbondale Coal & Coke Co.*, 140 U. S. 25, 40; *Goddard* v. *Ordway*, 101 U. S. 745, 749–751; *Zimmern* v. *United States*, 298 U. S. 167. See *Eddy* v. *Summers*, 183 Md. 683, 687, 39 A. 2d 812, 814.

cellation of an issued certificate. It is settled law, however, that appeals are allowable from federal and state courts. *Tutun* v. *United States,* 270 U. S. 568, 575, note 3, 580. This conclusion was reached in the face of the arguments there advanced that "exclusive jurisdiction" was conferred on the trial courts by the Act and that a means of review was granted to the United States by § 15. The reason which led this Court to allow appeals under the Naturalization Act was the same reason that should guide us here, that is, "A denial of a review in naturalization cases would engraft an exception upon an otherwise universal rule." P. 579; see pp. 578–580.

The ruling in the *Tutun* case compels a distinction sought to be made in today's opinion. The Court now holds that "§ 338 is the exclusive procedure for canceling citizenship on the score of fraudulent or illegal procurement based on evidence outside the record." Since *Tutun* sustained review that would on appeal set aside naturalization orders and cancel certificates on facts of record, the judgment today differentiates that case by making the existence of facts *dehors* the record, at least where they amount to fraud or illegal procurement, the decisive incident to bar state action on rehearing for newly discovered evidence. We think today's decision departs from the reasoning of the *Tutun* case and engrafts "an exception upon an otherwise universal rule."

The certainty that naturalization may be revoked by appeal determines another point. There is a suggestion in the Court's opinion, not elaborated, that Congress intended to bar state action for rehearing or vacation during term on facts *dehors* the record because to do otherwise "would gratuitously abandon the constitutional mandate to establish 'an uniform Rule of Naturalization.'" To allow procedure to be determined according to the particular court that the alien might utilize would not violate

the principle of uniformity.[8] That is the kind of uniformity that the *Tutun* case approves by impliedly allowing appeals under state procedure.

Interpretation of a statute by government officials charged with its administration carries weight.[9] A practice under that interpretation increases its importance. Apparently the Government avails itself of the local methods of directly attacking a judgment of naturalization within the term, or within limited periods under appropriate rules.[10] The Government, and in this *Bindczyck* case the Service, thus makes clear its understanding that § 338 does not limit the power of courts over judgments during term time.

When we consider that Congress was concerned with preventing fraud and illegal practices in naturalization, the Court's conclusion does not seem justified. It disregards well-established principles of statutory construction, without furthering the congressional purpose, and puts a useless burden on the Government without any ultimate benefit to the naturalized citizen. Such a formalistic approach to legal problems is not helpful to the administration of justice.

We think the judgment should be affirmed.

---

[8] *Hanover National Bank* v. *Moyses,* 186 U. S. 181, 189; *Wright* v. *Vinton Bank,* 300 U. S. 440, 463, n. 7; *Fernandez* v. *Wiener,* 326 U. S. 340, 359.

[9] Cf. *United States* v. *American Trucking Assns.,* 310 U. S. 534, 545.

[10] See, *e. g., Petition of Weltzien,* 68 F. Supp. 1000; *United States ex rel. Volpe* v. *Jordan,* 161 F. 2d 390.