Iracema Philippina SIMONS, Plaintiff-
Appellant,

v.

UNITED STATES of America, and the
Estate of John Simons, Deceased,
Defendants-Appellees.

No. 286, Docket 71–1734.

United States Court of Appeals,
Second Circuit.

Argued Nov. 11, 1971.

Decided Dec. 13, 1971.

Gerald J. McMahon, New York City (Edward J. Ennis, New York City, of counsel), for plaintiff-appellant.

Leo Guzik, New York City (Guzik & Boukstein, and David C. Birdoff, New York City, of counsel), for defendant-appellee, Estate of John Simons, Deceased.

T. Gorman Reilly, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., for the Southern District of New York, Stanley H. Wallenstein and Joseph P. Marro, Special Asst. U. S. Attys., of counsel), for defendant-appellee, United States.

Before FRIENDLY, Chief Judge, and HAYS, Circuit Judge, and DAVIS, Associate Judge.*

FRIENDLY, Chief Judge:

This appeal raises interesting and important questions concerning the right of a former wife to attack the naturalization decrees of her deceased husband and herself entered over a score of years before the instant proceedings were begun.

The allegations of Iracema Philippina Simons, the plaintiff and movant, which for present purposes we must assume to be true, were as follows: She was born in 1922 in Brazil, a citizen of Holland by virtue of her parentage. In 1946 she married, in Holland, John Simons, also a Dutch citizen. Mr. Simons had come to the United States during World War II, on an immigrant visa, in order to remain out of the hands of the Nazis, but had returned to Holland thereafter. After a brief trip to the United States in 1947, the couple returned to Europe. They again came back to this country in April, 1948. On May 5, 1948, John Simons secured a decree of naturalization from the District Court for the Southern District of New York, having made the required allegation of his intention to become a permanent resident. See Nationality Act of 1940, ch. 876, § 332(a) (18), 54 Stat. 1155. About five days later he returned to Europe and instructed his wife to remain in the United States until she also obtained American citizenship. Declaring an intention ultimately to reside permanently in the United States, she secured citizenship on July 22, 1948 under the provisions of § 312 of the Nationality Act of 1940, 54 Stat. 1145, which waived the required period of continuous residence within the United States in the case of the spouse of a United States citizen stationed abroad in the employ of an American firm engaged in developing the foreign trade and commerce of the United States. John's allegation of intention to become a permanent resident, Iracema's allegation—made at John's direction—that John was stationed abroad in the employ of Hercules Steel Corporation,

* Of the United States Court of Claims, sitting by designation.

120 Broadway, New York, N. Y., and Iracema's allegation of an intention to take up permanent residence in the United States on the termination of John's employment, were knowingly false. John's real intention since the end of World War II was to revive the family metal business in Rotterdam, "and the business of Hercules Steel Corporation, of which John Simons was the Vice President, was wholly incidental" to his presence in Europe to that end.

On August 1, 1948, Iracema, on John's instructions, left the United States to join him in Europe. They lived together at first in Brussels and thereafter in Holland, but paid income taxes as United States citizens in order to avoid higher Dutch taxation. In December, 1962, Iracema began an action for separation in the Supreme Court, New York County; in consequence of a separation agreement executed before the United States consul at Amsterdam, the action was discontinued. Meanwhile, in February, 1964, a Mexican decree of divorce was entered in an action instituted by Iracema, in which both parties appeared by attorney. Her consent to the discontinuance of the New York separation action and the institution of the Mexican divorce action was obtained by John's threat otherwise to kill or injure her or arrange for her confinement in a mental institution. John died in Switzerland in November, 1968, leaving a large estate, which except for some minor bequests, he willed entirely for educational and scientific purposes. Although the papers do not say this, we were told at argument that, since the divorce, Mrs. Simons had been living in Spain.

In March, 1970, Mrs. Simons filed a complaint in the District Court for the Southern District of New York against the United States and the Estate of John Simons, seeking a decree that at no time was she or John a lawful citizen of the United States. In August, 1970, she filed motions in the two naturalization proceedings for the same relief. Her avowed purpose was to place herself in a position where Dutch law would govern their status and the legality of the Mexican divorce, the hope being that this would be declared invalid and that she would thereby become entitled to share in John's estate.[1] The United States filed an answer and moved for summary judgment dismissing the complaint; the Estate moved under F.R.Civ.P. 12(b) to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. The district court denied all of the defendants' motions, 413 F.Supp. 531, concluding that a private person was entitled to attack her own naturalization or, assuming the presence of a legal interest which would be affected, that of another (even if the latter was deceased). Nevertheless the court *sua sponte* dismissed the complaint on the ground that Mrs. Simons was estopped from maintaining the action because of her long acceptance of the benefits of American citizenship. It thus also effectively denied Mrs. Simons' motions in the naturalization proceedings, for it deemed these to be mere "surplus" in light of the independent action initiated by her complaint. We affirm the court's orders of dismissal and denial, but on grounds different from those on which it relied.

The only federal statute dealing expressly with denaturalization is § 340 of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1451, the pertinent parts of which are set out in the margin.[2] This is the lineal descendant,

---

1. It goes without saying that we intimate no view with respect to what attitude a court in Holland or elsewhere might take concerning any of these matters, irrespective of our decision here, if Iracema can sustain her allegations.

2. (a) It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 310 of this title in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate

by way of § 338 of the Nationality Act of 1940, 54 Stat. 1158, of § 15 of the Nationality Act of June 29, 1906, 34 Stat. 601. As developed by Mr. Justice Frankfurter in Bindczyck v. Finucane, 342 U.S. 76, 79–83, 72 S.Ct. 130, 132, 96 L.Ed. 100 (1951), the 1906 Act "was the culmination of half a century's agitation directed at naturalization frauds, particularly in their bearing upon the suffrage." To cope with that problem Congress devised measures to prevent fraudulent naturalization and also "a carefully safeguarded method for denaturalization," since "experience was not wanting of the dangers and hardships attendant on haphazard denaturalization."

The question before the Supreme Court in *Bindczyck* was whether a Maryland court which had issued a certificate of naturalization had power to vacate this seven days later, at the same term of court, on motion of an Immigration and Naturalization Examiner (rather than the United States attorney) and without complying with the procedural safeguards of what is now § 340(b). The question arose by way of an action by Bindczyck for a declaratory judgment that he was still a citizen. The Court of Appeals for the District of Columbia Circuit held that the provision authorizing United States attorneys to bring plenary actions for the denaturalization was "cumulative in effect and does not exclude the other available remedies for setting aside and vacating naturalization orders as judgments at least while the issue is still in the course of its original proceeding." Finucane v. Bindczyck, 87 U.S.App.D.C. 137, 184 F.2d 225, 232 (1950). The Supreme Court reversed, saying, 342 U.S. at 83, 72 S.Ct. at 134, 96 L.Ed. 100:

> In the light of [the] legislative history we cannot escape the conclusion that in its detailed provisions for revoking a naturalization because of fraud or illegal procurement not appearing on the face of the record, Congress formulated a self-contained, exclusive procedure. With a view to protecting the Government against fraud while safeguarding citizenship from abrogation except by a clearly defined procedure, Congress insisted on the detailed, explicit provisions of § 15. To find that at the same time it left the same result to be achieved by the confused and conflicting medley, as we shall see, of State procedures for setting aside local judgments is to read congressional enactment without respect for reason.

The Court also said, 342 U.S. at 84, 72 S.Ct. at 134, that once citizenship was granted,

> it was to be proof against attacks for fraud or illegal procurement based on evidence outside the record, except

---

of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively: * * *.

(b) The party to whom was granted the naturalization alleged to have been illegally procured or procured by concealment of a material fact or by willful misrepresentation shall, in any such proceedings under subsection (a) of this section, have sixty days' personal notice, unless waived by such party, in which to make answer to the petition of the United States; and if such naturalized person

be absent from the United States or from the judicial district in which such person last had his residence, such notice shall be given either by personal service upon him or by publication in the manner provided for the service of summons by publication or upon absentees by the laws of the State or the place where such suit is brought.

　　　*　　　*　　　*　　　*　　　*

(j) Nothing contained in this section shall be regarded as limiting, denying, or restricting the power of any naturalization court, by or in which a person has been naturalized, to correct, reopen, alter, modify, or vacate its judgment or decree naturalizing such person, during the term of such court or within the time prescribed by the rules of procedure or statutes governing the jurisdiction of the court to take such action.

through the proceedings prescribed in § 15. The congressional scheme, providing carefully for the representation of the Government's interest before the grant of citizenship and a detailed, safeguarded procedure for attacking the decree on evidence of fraud outside the record, covers the whole ground. Every national interest is thereby protected.

It denounced the argument that a naturalization decree, like any other judgment, "is subject to revocation for fraud or illegal procurement during the term of the court that granted it" as "mechanical jurisprudence in its most glittering form," since the contention disregarded "all those decisive considerations by which a provision like § 338 derives the meaning of life from the context of its generating forces and its purposes." 342 U.S. at 85, 72 S.Ct. at 135. If this were where matters still stood, it would be hard to avoid the conclusion that § 340 affords the *only* method for attacking a naturalization decree, and thus that only United States attorneys could institute such attacks. To be sure, the precise issue in *Bindczyck* was narrow —whether the Government could obtain denaturalization by a motion in the naturalization court before the expiration of the term rather than by a proceeding under what is now § 340—but the language of the opinion was so broad that the conclusion of absolute exclusivity would have been rather irresistible.

*Bindczyck*, however, is not the last word. That case was decided while what is now the Immigration and Nationality Act of 1952 was wending its way through the Congress. That body included in the Act a new subsection (j) for § 340, quoted above, see fn. 2. Although the legislative history, S.Rep. No.1137, H.R.Rep.No.1365, Conf.Rep. No.2096, 82d Cong., 2d Sess.; 98 Cong.

Rec. 6947–86 (1952), U.S.Code Cong. & Admin.News 1952, p. 1653, sheds no light on the purpose of the new subsection, it obviously overruled the *Bindczyck* holding that the Government was always required to proceed by independent action rather than avail itself of more summary procedures available under rules or statutes governing the jurisdiction of the naturalization court.

The only subsequent Supreme Court decision casting any light upon the problem is United States v. Zucca, 351 U.S. 91, 76 S.Ct. 671, 100 L.Ed. 964 (1956). There again the issue was a limited one, namely, whether when a United States attorney had commenced an independent action for denaturalization, the filing of the affidavit showing good cause specified in § 340(a) was a prerequisite to maintenance of the suit. The Government argued it was not, claiming, as it had in *Bindczyck*, that § 340(a) was only supplementary to the general authority conferred on United States attorneys by 28 U.S.C. § 507(a) (2) (1964), now 28 U.S.C. § 547(2) (1971), to prosecute "for the Government, all civil actions, suits or proceedings in which the United States is concerned" and, more specifically, that § 340(a) merely imposes the "additional duty . . . to act, not alone on their own knowledge and judgment, but on the basis of an affidavit of good cause furnished by private citizens." [3] The Court held otherwise. Replying to the contention that "the affidavit is required only when the proceeding is to be brought on the complaint of a private citizen," the Court said it "need not decide whether a private citizen may ever file such a complaint" [4] since the Government here "laid its complaint expressly under § 340(a)." 351 U.S. at 95, 76 S.Ct. at 674. Responding to an argument that § 340(j) abrogated "the effect of the hold-

3. Brief for United States at 13–14, United States v. Zucca, 351 U.S. 91, 76 S.Ct. 671, 100 L.Ed. 964 (1956).

4. Although on its face this language is not altogether clear, examination of the brief for the United States, *supra*, at 33–41,

makes it plain that the Court was referring to a complaint *to the United States Attorney* on the basis of which the latter would be bound to act—not to an independent complaint by a private citizen which would itself initiate an action.

ing" in *Bindczyck*,[5] it said that subsection (j) only abrogated "[t]he specific holding [of *Bindczyck*], that § 338(a) of the 1940 Act overrode local rules concerning time limitations upon the power of state courts to reopen their judgments" but that "[t]he underlying philosophy of *Bindczyck* remains intact." 351 U.S. at 95 n. 8, 76 S.Ct. at 674. In addition, the Court saw fit to quote at length Mr. Justice Frankfurter's sweeping language concerning the naturalization provision's purpose of establishing an exclusive procedure for instituting actions to challenge naturalization decrees. 351 U.S. at 99, 76 S.Ct. 671, 100 L.Ed. 964, quoting from 342 U.S. at 83, 84, 72 S.Ct. 130, 96 L.Ed. 100 (quoted *supra*). The Court concluded that § 340(a) "is the only Section under which a United States attorney may institute denaturalization proceedings . . .." 351 U.S. at 99, 76 S.Ct. at 676.[6]

Since the instant proceedings were not brought under § 340(a), any power of the district court to vacate the 1948 naturalization decrees here at issue must be within the comprehension of F.R.Civ.P. 60(b). We think it worth-while to set this out in the margin,[7] familiar though it be. We consider first whether, even if we were to assume in Mrs. Simons' favor that in cases where the proceeding is by motion, § 340(j) lifted all restrictions otherwise derivable from the broad language of *Bindczyck*, rather than simply providing an alternative procedure for the Government, the district court had power to entertain her motions to vacate the naturalization decrees. The answer is clearly negative. Her allegations were of fraud, but she did not allege fraud "of an adverse party," as required by (3), and, in any event, her motions were not made within the required one year after the decrees were entered. She fares no better under the residual clause (6). Since clause (3) permits relief only for fraud of an adverse party and only if the motion is made within one year, it would be reading clause (6) most perversely to say that it authorizes attack for one's own or a non-adverse party's fraud twenty-two years after the judgment. Whether clause (6) might authorize attack by motion on one's own naturalization by a person tricked or forced into petitioning

5. Brief for United States, *supra*, at 36 n. 5.

6. This could not have meant that the United States attorney may not proceed by motion under F.R.Civ.P. 60(b) as permitted by § 340(j), the very purpose of that subsection, see In re Campbell's Petition, 326 F.2d 101 (2 Cir. 1964), but rather that if he proceeds by plenary action, he must do so under § 340.

7. (b) Mistake; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc. On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided in Title 28, U.S.C., § 1655, or to set aside a judgment for fraud upon the court. Writs of coram nobis, coram vobis, audita querela, and bills of review and bills in the nature of a bill of review are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action.

for it is a question we need not decide, since Mrs. Simons' motion made no such claim.

 This brings us to the question whether Mrs. Simons can derive any sustenance for her plenary action from the penultimate sentence of Rule 60(b). We begin by noting that the sentence is not an affirmative grant of power by the Rule, but rather a statement that the Rule's specification of six grounds for relief by motion "does not limit" whatever power the court would otherwise have to entertain an independent action. This is of particular importance here since the effect of § 340(j) on *Bindczyck* was only to permit a judgment of naturalization to be corrected during the term "or within the time prescribed by the rules of procedure or statutes governing the jurisdiction of the court to take such action" and did not extend to actions that might be brought at any time, subject only to statutes of limitations, "to relieve a party from a judgment, order, or proceeding . . . or to set aside a judgment for fraud upon the court."[8] In other words, § 340(j) does not touch upon the equitable power of a court to entertain an independent action attacking a judgment for reason of fraud in its procurement—or upon whether any such general power exists in the context of naturalization decrees. Mrs. Simons' plenary action must therefore be viewed in the light of the sweeping, yet delimiting, language of *Bindczyck*, of the Court's reiteration of much of that language in *Zucca* and its statement there that the "underlying philosophy" of *Bindczyck* "remains intact," 351 U.S. at 95 n. 8, 76 S.Ct. 671, 100 L.Ed. 964, and of its intimations in *Zucca* that the appropriate procedure for a person believing there was good cause for such an action would be to file a "complaint" with the United States attorney, see fn. 4.

The view that a private action will not lie to rescind a decree of naturalization is reinforced by Pintsch Compressing Co. v. Bergin, 84 F. 140, 142 (C.C.D. Mass.1897), where Judge Putnam said:

> The fundamental principle that, in the absence of a statute of authorization, only the United States can proceed judicially to recall or rescind franchises granted by them, has peculiar force with reference to citizenship, as to which so great a variety of interests, political and individual, of high importance, is concerned that the jurisdiction of inquiry should be especially fixed and limited.

This inference is strong that when, nine years later, Congress enacted the predecessor of § 340, it provided not merely one method but the only method for challenging naturalization decrees by independent action.

 If we entertained a different view on the points so far discussed, we would nevertheless affirm the order of dismissal and denial, on the ground of laches. Both the complaint and the motions turn on John Simons' intention to reside in the United States when he and his wife petitioned for naturalization and on the nature of his employment by Hercules Steel Corporation 22 years before these proceedings were brought. His testimony would have been of the utmost importance, on an issue on which both he and the United States would have had an important interest. If the facts were as Mrs. Simons now represents, they must have been known to her long ago. The papers reveal no reason for the inordinate and prejudicial delay. *Cf.* Sciria v. United States, 238 F.2d 77 (6 Cir. 1956). Apparently Mrs. Simons was quite content with the situation until the divorce in 1964; even then she did nothing until her husband's death in 1968 opened new vistas at a time when contradiction by him was no longer pos-

---

8. It is worth noting that the allegations in the complaint showed only a fraud upon the United States, not "upon the court," within the strict construction we have given that phrase. Martina Theatre Corp. v. Schine Chain Theatres, Inc., 278 F.2d 798, 801 (2 Cir. 1960); Hawkins v. Lindsley, 327 F.2d 356, 359 (2 Cir. 1964). Cf. 7 Moore, Federal Practice ¶ 60.33, at 512–13 (1970).

sible. Costello v. United States, 365 U. S. 265, 281, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961), holding laches not to be a defense to a denaturalization proceeding by the Government, does not assist her.

Affirmed.