Irina GORBACH; Jose Luis Rosas–Madrid; Agueda Escalante; Ruben Lara; Javier Sanguino; Mac Maurice Chukwud Ijeaku; Loreto Moncado Juan; Pedro Legarda–Legarda; Adolpho Erazo, Plaintiffs–Appellees,

v.

Janet RENO, Attorney General of the United States; Doris M. Meissner, Commissioner of Immigration and Naturalization Service; United States Immigration and Naturalization Service, Defendants–Appellants.

No. 98–35723.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 2, 1999.

Filed June 4, 1999

---

Michelle R. Slack, United States Department of Justice, Office of Immigration Litigation, Washington D.C., for the defendants-appellants.

Jonathan S. Franklin, Hogan & Hartson, Washington D.C., for the plaintiffs-appellees.

Before: ALARCON, RYMER, and KLEINFELD, Circuit Judges.

Opinion by Judge RYMER; Dissent by Judge KLEINFELD.

RYMER, Circuit Judge:

The question before us is whether the Attorney General, who has the exclusive power to naturalize, has the statutory authority to reopen and revoke her orders of naturalization on grounds of fraud, material misrepresentation or ineligibility for naturalization subject to de novo judicial review by an Article III court.

The Immigration Act of 1990, § 401(a), 8 U.S.C. § 1421(a), transferred the sole authority to naturalize from state courts of record and federal district courts to the Attorney General, without limiting the Attorney General's power to reopen and vacate an order of naturalization.[1] The Attorney General delegated her power to the Immigration & Naturalization Service (INS), which in turn promulgated a regulation, 8 C.F.R. § 340.1, providing for administrative reopening and revocation of naturalization orders where there is evidence that the order of naturalization was procured illegally, fraudulently or by material misrepresentation. Irina Gorbach and other named plaintiffs in behalf of a class of persons who had been naturalized by the Attorney General, but who received a Notice of Intent to Revoke Naturalization (NOIR), challenged the regulation on the grounds that it violates due process, the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq., and the INA, 8 U.S.C. § 1101 et seq.[2] Only the issue of the At-

---

1. The Immigration Act of 1990, Pub.L. No. 101–649, tit. IV, §§ 401–08, 104 Stat. 4978, 5038–48 (codified at various sections of 8 U.S.C.), effected substantial amendments to the Immigration and Nationality Act of 1952 (INA, or "the Act").

2. The named plaintiffs are Irina Gorbach, Jose Luis Rosas–Madrid, Agueda Escalante, Ruben Lara, Javier Sanguino, Mac Maurice Chukwud Ijeaku, Loreto Moncado Juan, Pedro Legarda–Legarda, and Adopho Erazo (collectively "Gorbach"). The proceedings against Gorbach, Erazo and Lara were dismissed at the administrative level. The class was certified after the preliminary injunction was issued. The defendants are Janet Reno, Attorney General of the United States; Doris

torney General's statutory authority under the INA to promulgate Regulation 340.1 was reached by the district court and raised on this appeal.[3] The district court found that sufficiently serious questions were presented to warrant a preliminary injunction enjoining the INS from initiating or continuing administrative denaturalization proceedings under Regulation 340.1. *See Gorbach v. Reno,* 181 F.R.D. 642, 650 (W.D.Wash.1998).

Because Gorbach's facial challenge raises only a legal issue that requires no factual development to resolve, we consider the question de novo rather than through the lens of an interlocutory order. So viewed, we conclude that the Attorney General does not lack statutory authority to reopen and reconsider her own orders of naturalization. Accordingly, we vacate the preliminary injunction as moot.

## I

### A

The statutory framework, old and new, is central to this case so we describe it in detail.

Before 1990, INA § 310(a) conferred the jurisdiction to naturalize persons as United States citizens exclusively upon district courts of the United States and all courts of record in any state or territory. *See* 8 U.S.C. § 1421(a) (1970) (pre–1990 version). There were two routes for revocation of naturalization orders, both judicial: one, a proceeding initiated under INA § 340(a) in any of the courts specified in INA § 310(a) by affidavit of a United States Attorney showing good cause for setting aside the order admitting a person to citizenship on the ground that the order was illegally procured or was procured by concealment of a material fact or misrepresentation, *see* 8 U.S.C. § 1451(a) (1970);[4] the other, a proceeding pursuant to the power of the court to reopen and vacate its judgments under INA § 340(i). *See* 8 U.S.C. § 1451(i) (1970).[5] It is generally agreed that this avenue was added by Congress to overrule the Supreme Court's decision in *Bindczyck v. Finucane,* 342 U.S. 76, 72 S.Ct. 130, 96 L.Ed. 100 (1951), which held that INA § 340(a) afforded the exclusive route for revocation. *See Simons v. United States,* 452 F.2d 1110, 1114 (2d Cir. 1971). In any event, "old" INA § 340(i) provided:

(i) **Power of court to correct, reopen, alter, modify or vacate judgment or decree**

Nothing contained in this section shall be regarded as limiting, denying, or restricting the power of any naturalization court, by or in which a person has been naturalized, to correct, reopen, alter, modify, or vacate its judgment or decree naturalizing such person, during the term of such court or within the time prescribed by the rules of procedure or

---

M. Meissner, Commissioner of the INS; and the INS. We will generally refer to the arguments they collectively present as being made by Reno or the INS.

**3.** For this reason we express no opinion on whether the regulation comports with due process or the APA.

**4.** INA § 340(a); 8 U.S.C. § 1451(a) (1970) provided in pertinent part:

(a) It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 1421 of this title in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking

and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were produced by concealment of a material fact or by willful misrepresentation, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively: . . .

**5.** Subsection (i) started life as subsection (j), but was redesignated (i) as a result of a 1988 amendment to the INA. We refer to it as (i) to avoid confusion, as that was its designation immediately before the 1990 Immigration Act amendments which are at issue in this appeal.

statutes governing the jurisdiction of the court to take such action.

In 1990, the structure was changed significantly. The Immigration Act of 1990 amended INA § 310(a) to transfer the exclusive power to naturalize from the courts to the Attorney General. *See* 8 U.S.C. § 1421(a) (Supp.1998).[6] United States district courts and state courts of record continue to have authority to administer oaths under INA § 310(b), and federal district courts have authority under INA § 340(a) to revoke naturalization upon affidavit of the United States Attorney, as before. *See* 8 U.S.C. § 1451(a) (Supp.1998).[7] However, district courts have a new power of judicial review under INA § 310(c), which provides:

> A person whose application for naturalization under this subchapter is denied, after a hearing before an immigration officer under section 1447(a) of this Title, may seek review of such denial before the United States district court for the district in which such person resides in accordance with chapter 7 of Title 5. Such review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application.

8 U.S.C. § 1421(c) (Supp.1998). The Immigration Act of 1990 also replaced INA § 340(i), which previously pertained to the "[p]ower of court to correct, reopen, alter, modify or vacate judgment or decree," with new INA § 340(h), which now reads as follows:

> (h) **Power to correct, reopen, alter, modify, or vacate order**
>
> Nothing contained in this section shall be regarded as limiting, denying, or restricting the power of the Attorney General to correct, reopen, alter, modify, or vacate an order naturalizing the person.

8 U.S.C. § 1451(h) (Supp.1998).

Pursuant to INA § 103(a)(4), the Attorney General delegated her authority to the INS.[8] *See* 8 C.F.R. § 310.1(b). The INS,

---

**6.** Amended INA § 310(a); 8 U.S.C. § 1421(a) provides: ·
> The sole authority to naturalize persons as citizens of the United States is conferred upon the Attorney General.

**7.** Amended INA § 340(a); 8 U.S.C. § 1451(a) is substantively unchanged and now provides:
> (a) **Concealment of material evidence; refusal to testify**
>
> It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any district court of the United States in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively: ...

**8.** INA § 103; 8 U.S.C. § 1103, provides in pertinent part:

> (a)(1) The Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: ...
>
> (a)(3) [She] shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as [she] deems necessary for carrying out [her] authority under the provisions of this chapter.
>
> (a)(4) [She] may require or authorize any employee of the Service or the Department of Justice to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon any other employee of the Service.

8 U.S.C. § 1443 concerns rules and regulations governing the examination of applicants, and provides in pertinent part:
> (a) The Attorney General shall make such rules and regulations as may be necessary to carry into effect the provisions of this part and is authorized to prescribe the scope and nature of the examination of

following notice and comment, promulgated the final (and current) version of the regulation challenged in this case on October 28, 1996. *See* Revocation of Naturalization, 61 Fed.Reg. 55550 (1996) (codified at 8 C.F.R. pt. 340). Section 340.1, the regulation directly at issue, provides for reopening of a naturalization application by an INS district director pursuant to INA § 340(h); 8 C.F.R. § 340.2 provides for revocation proceedings pursuant to INA § 340(a), the judicial revocation provision. Under Regulation 340.1, the Service may reopen a naturalization proceeding and revoke naturalization if it obtains "credible and probative evidence" which:

(1) Shows that the Service granted the application by mistake; or

(2) Was not known to the Service Officer during the original naturalization proceeding; and-

(i) Would have had a material effect on the outcome of the original naturalization; and

(ii) Would have proven that:

(A) The applicant's application was based on fraud or misrepresentation or concealment of a material fact; or

(B) The applicant was not, in fact, eligible for naturalization.

8 C.F.R. § 340.1(a). We set out the full text of § 340.1 in Appendix I, but in sum the procedures for reopening contemplate a notice of intent that describes the grounds the district director believes warrant reopening, to which the applicant may respond;[9] the applicant may request a hearing before an immigration officer authorized to review naturalization applications, and has the right to counsel; the applicant bears the burden of persuading the district director that he was eligible for naturalization at the time of the order; a record is to be kept of the reopened proceedings; a written decision consisting of

findings of fact and conclusions of law as well as a final determination on the naturalization application shall be filed; and instead of reopening the naturalization decision and revoking naturalization, the district director must refer a case for judicial revocation proceedings if a factual issue is raised that will depend on witness credibility to resolve. The applicant may appeal an adverse decision to the Service's Office of Examinations, Administrative Appeals Unit, and the district director may reconsider the decision to reopen the naturalization application and affirm the original decision naturalizing the applicant. Otherwise, if the order is revoked and the application is denied, the applicant may seek judicial review in accordance with INA § 310(c). In either case the applicant retains citizenship until a decision to deny naturalization becomes final.

## B

Under the new regime, naturalization was granted to more than a million applicants in circumstances that reportedly led to concern that many may not have revealed disqualifying conditions. KPMG–Peat Marwick was retained to conduct an audit, and found that over six thousand naturalization orders may have been fraudulently obtained. As a result, the INS began in mid–1997 to issue Notices of Intent to Revoke Naturalization.

Irina Gorbach was among those who received a NOIR. She and her co-plaintiffs filed a class action against Attorney General Reno and the INS on March 5, 1998 for declaratory and injunctive relief. They seek to invalidate Regulation 340.1 as without authority in the Immigration and Nationality Act, and as contrary to the Administrative Procedures Act and the Due Process Clause of the Fifth Amend-

---

applicants for naturalization as to their admissibility to citizenship. . . .

8 C.F.R. § 310.1(b) provides:

Pursuant to § 2.1 of this chapter, the Commissioner of the Immigration and Naturalization Service is authorized to perform such acts as are necessary and proper to

implement the Attorney General's authority under the provisions of section 310 of the Act.

**9.** Failure to respond is deemed an admission of the grounds for reopening and revoking naturalization. 8 C.F.R. § 340.1(b)(4)(ii).

ment. Meanwhile, Gorbach sought a preliminary injunction to restrain the INS from instituting, continuing or deciding any pending administrative denaturalization proceedings under § 340.1. Reno moved to dismiss the complaint on the ground that Gorbach lacked standing and the suit was not justiciable. The district court denied Reno's motion to dismiss and granted Gorbach's request for preliminary injunction, enjoining the Service "from initiating or continuing administrative denaturalization proceedings under § 340.1 pending final resolution of this case on the merits." *Gorbach,* 181 F.R.D. at 650. Reno timely appealed.

Subsequently (and not at issue on this appeal), the district court certified a nationwide class of naturalized individuals who are or will be placed in administrative denaturalization proceedings. The district court, and a motions panel of our court, denied Reno's motion for a stay pending appeal.

## II

■ Because Reno raises the issue of our jurisdiction, we must address it first. She contends that there is no final agency action since none of the named plaintiffs has yet had naturalization administratively revoked. Like the administratively issued complaint in *FTC v. Standard Oil Co. of California,* 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980), she argues that the NOIRs issued in this case serve only to initiate proceedings and to put individuals on notice of the need to respond. They do not, in her view, have legal or practical effect as the recipient is still considered to be a United States citizen until all remedies are exhausted. Further, Reno points out, the administrative process provides significant procedural safeguards that make judicial intervention at this time unnecessary.

■ We agree with the district court that Gorbach does not lack standing to proceed with the narrow challenge that is actually before us to the Attorney General's statutory authority to provide for administrative reopening and revoking of naturalization orders. Gorbach has received a NOIR and must respond on pain of having the charges against her conceded and her citizenship subject to forfeiture. She is thus required to put her citizenship on the line in an administrative proceeding that she claims the INS lacks statutory authority even to undertake. Under the law of this circuit, it is not speculative to find procedural injury on account of being haled into administrative proceedings for which there may be no authority. *See Yesler Terrace Community Council v. Cisneros,* 37 F.3d 442, 445–46 (9th Cir. 1994) (tenants in housing project served with notice of eviction have standing). Thus, whether or not her citizenship is ultimately retained, Gorbach has a concrete interest in not being forced to respond to process that is arguably unlawful.[10] *See INS v. Legalization Assistance Project,* 510 U.S. 1301, 1303, 114 S.Ct. 422, 126 L.Ed.2d 410 (1993) (O'Connor, J., in chambers) ("A federal court ... generally ought not entertain a request for an injunction or declaratory judgment regarding the validity of an administrative regulation unless it is brought by someone who has actually been concretely affected by the regulation." (Citing *Reno v. Catholic Social Serv., Inc.,* 509 U.S. 43, 57–58, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993))); *Stoianoff v. Montana,* 695 F.2d 1214, 1223 (9th Cir.1983) (mere existence of statute which may or may not ever be applied is not sufficient to create case or controversy, unlike situation where plaintiff demonstrates genuine threat that allegedly unconstitutional law is about to be enforced against him).

Because hers is a facial challenge only, we are not called upon to consider how the procedures adopted in Regulation 340.1 play out. The situation would be different if we were. If Gorbach were challenging more than the Attorney General's facial

---

10. Although proceedings against Gorbach herself were dismissed, this does not affect standing of the class representatives whom we continue to refer to as "Gorbach."

authority to reopen and revoke, then standing, ripeness, and exhaustion-other prudential grounds also raised by Reno-would of course be implicated. *Cf., e.g., Catholic Social Serv.,* 509 U.S. at 58, 113 S.Ct. 2485 (dispute not ripe where challenged immigration regulations "impose no penalties for violating any newly imposed restriction," and there was insufficient evidence demonstrating they had yet been applied to plaintiff class); *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 164, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) (pre-enforcement dispute not ripe for review where regulation's impact could not "be said to be felt immediately by those subject to it in conducting their day-to-day affairs"); *Abbott Labs. v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (pre-enforcement dispute ripe where promulgation of challenged regulations alone presented plaintiffs with immediate dilemma of choosing between compliance with the onerous regulations and serious penalties for violation). However, in the circumstances presented, Gorbach's claim that the Attorney General lacks authority to reopen her naturalization proceeding is ripe because the INS has given notice of its intent to do precisely that. Because she must respond or be deemed to have defaulted her status as a naturalized citizen, Gorbach also has sufficient concrete and particularized injury to assert the claim she presses. Accordingly, the district court did not err in exercising jurisdiction.

## III

■ Ordinarily, when considering a district court's grant of a preliminary injunction we review its findings for clear error, its legal premises de novo, and its decision to grant the relief requested for abuse of discretion. *See Miller v. California Pac. Med. Ctr.,* 19 F.3d 449, 455 (9th Cir.1994) (en banc). However, Reno's appeal presents solely the legal question of the INS's statutory authority to reopen naturalization applications and vacate naturalization orders. The facts are of no controlling significance on this issue.[11] Under these circumstances, we may give the legal question plenary review even though the appeal is from the entry of a preliminary injunction. *See Thornburgh v. Am. College of Obstetricians and Gynecologists,* 476 U.S. 747, 757, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), *overruled on other grounds, Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).[12]

■ We believe we should do so here. This is a matter of obvious importance both to those who are subject to NOIRS, and to the government. Congress put a new system in place when it gave exclusive responsibility for naturalization to the Attorney General, and the public interest counsels in favor of bringing certainty to the process as quickly as possible. *Cf. Legalization Assistance Project,* 510 U.S. at 1305–06, 114 S.Ct. 422 (noting that balance of equities tips in favor of the INS in light of district court order requiring it to stay deportations and issue employment authorizations, in part because of the administrative burden on the INS and in part because of the attendant delay in the deportation of aliens who are properly deportable). If naturalization proceedings cannot be reopened administratively when fraud or ineligibility is suspected, the al-

11. We emphasize that this is our view *only* on the issue of statutory authorization; we do not know, and express no view on, the extent to which any other issues in this case that are not before us on appeal require factual development or actual application of the regulation.

12. *See also Maldonado v. Houstoun,* 157 F.3d 179, 183 (3d Cir.), *cert. denied,* —— U.S. ——,

119 S.Ct. 1802, 143 L.Ed.2d 1007 (1999) (addressing merits on appeal from preliminary injunction raising constitutionality of state statute); *Planned Parenthood of the Blue Ridge v. Camblos,* 155 F.3d 352, 359 (4th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1031, 143 L.Ed.2d 40 (1999) (same).

ternative is for the INS to initiate denaturalization proceedings through the United States Attorney, since naturalization proceedings-which no longer take place in court-can no longer be reopened in court. The passage of time can only make the burden that dilemma poses for the INS, United States Attorney's Offices, and the courts more severe. On the other hand, no matter how we construe the Act, if we are wrong in divining congressional intent, Congress can promptly act to overrule us.

■ Finally, we are influenced by the fact that in this circuit, a preliminary injunction will issue if the moving party demonstrates either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits are raised and the balance of hardships tips sharply in her favor. *See Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir.1987). Here, the district court relied on the second prong, determining that Gorbach raised a serious question about the INS's statutory authority to authorize and implement administrative denaturalization proceedings. It is hard to dispute the seriousness of the question Gorbach raises, as the procedure is novel and precedent is scarce. Yet because the issue of statutory authorization is purely a matter of law, it seems incongruous for us to leave it unresolved simply because the question is serious (all that is required for a preliminary injunction) and the district court was within its discretion in so finding. In such a case, " '[t]he customary discretion accorded to a District Court's ruling on a prelimi-

nary injunction yields to our plenary scope of review as to the applicable law.' " *Thornburgh*, 476 U.S. at 757, 106 S.Ct. 2169 (quoting *Am. College of Obstetricians and Gynecologists v. Thornburgh*, 737 F.2d 283, 290 (3d Cir.1984)). Therefore, since both parties agree that the issue is as ripe and the record is as developed now as it will ever be, and that no further proceedings in the district court are necessary, we shall proceed to decide the merits.

## IV

■ There is no debate that the 1990 amendments explicitly confer on the Attorney General the exclusive power to naturalize. There also is no doubt that the INA explicitly recognizes that § 340 does not limit, deny or restrict the power of the Attorney General to reopen and to vacate an order of naturalization. The difficulty is that the statute nowhere says, in so many words, that the Attorney General *shall* have the authority to reopen.

Gorbach relies heavily on the fact that no statute expressly gives the INS the authority to take away citizenship. She argues that the Act provides only for judicial denaturalization, and prohibits the Attorney General from affecting the citizenship of any individual. *See* 8 U.S.C. § 1453 (1970).[13] Thus, as she sees it, there is no way that the positive power to reopen can be inferred from the "savings clause," which is merely negative and does not itself authorize the Attorney General to do anything. In addition, Gorbach submits

---

13. INA § 342; 8 U.S.C. § 1453 provides:

The Attorney General is authorized to cancel any certificate of citizenship, certificate of naturalization, copy of a declaration of intention, or other certificate, document or record heretofore issued or made by the Commissioner or a Deputy Commissioner or hereafter made by the Attorney General if it shall appear to the Attorney General's satisfaction that such document or record was illegally or fraudulently obtained from, or was created through illegality or by fraud practiced upon, [her] or the Commissioner or a Deputy Commissioner; but the

person for or to whom such document or record has been issued or made shall be given at such person's last-known place of address written notice of the intention to cancel such document or record with the reasons therefor and shall be given at least sixty days in which to show cause why such document or record should not be canceled. The cancellation under this section of any document purporting to show the citizenship status of the person to whom it was issued shall affect only the document and not the citizenship status of the person in whose name the document was issued.

that judicial denaturalization pursuant to INA § 340(a) would be rendered superfluous were administrative denaturalization also available. In any event, she contends, the INS's claimed authority far exceeds the authority previously exercised by courts pursuant to their power to revisit rulings under Rule 60(b); rather, the agency's inherent power to reopen, to the extent it exists at all, is limited to correcting ministerial errors and does not extend to revoking naturalization.

Reno argues, in response, that this does not matter as the power to grant or deny naturalization inherently authorizes the Attorney General to reopen and revoke naturalization orders because she has the overall responsibility of administering the Act, and the power to promulgate regulations necessary to implementing her authority. In her view, Congress explicitly recognized this was so by acknowledging that "[n]othing contained in this section shall be regarded as limiting, denying, or restricting the power of the Attorney General to correct, reopen, alter, modify, or vacate an order naturalizing the person." 8 U.S.C. § 1451(h). Nor does Reno see any basis for measuring the Attorney General's authority by reference to Federal Rule of Civil Procedure 60(b), or for inferring from the fact that there are differences between Regulation 340.1 and Rule 60(b) that the regulation somehow lacks statutory authority. Instead, Reno points out that when Congress transferred the power to naturalize to the Attorney General, it intentionally eliminated the reference to court term and rules in the savings clause that formerly governed the courts' summary reopening procedure. In Reno's view, this reflects congressional intent to leave her with the same power to reopen as the courts had before.

As we shall explain, we conclude that the Attorney General has the better position.

### A

Although the Attorney General's authority to promulgate a regulation providing for reopening and revoking naturalization orders will ultimately turn on the statutory scheme itself, we are guided by several general principles.

■ First, where, as here the empowering provision of a statute states simply that the agency may "make ... such rules and regulations as may be necessary to carry out the provisions of this Act," ... a regulation promulgated thereunder will be sustained so long as it is "reasonably related to the purposes of the enabling legislation." *Balelo v. Baldrige*, 724 F.2d 753, 760 (9th Cir.1984) (en banc) (quoting *Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973) (citations omitted)).

■ Second, because American citizenship is such a precious right, summary revocation procedures are disfavored. *See Magnuson v. Baker*, 911 F.2d 330, 335 n. 11 (9th Cir.1990) (discussing INA § 340(i) under pre–1990 law). For this reason, we expect notice and opportunity to be heard before naturalization can be revoked, and exceptional grounds such as fraud or misrepresentation to exist before the authority to revoke a citizenship judgment is exercised. *Id.* at 335–36.

■ Third, we must be especially "sensitive to the citizen's rights where the proceeding is nonjudicial because of '[t]he difference in security of judicial over administrative action.'" *United States v. Minker*, 350 U.S. 179, 188, 76 S.Ct. 281, 100 L.Ed. 185 (1956) (quoting *Ng Fung Ho v. White*, 259 U.S. 276, 285, 42 S.Ct. 492, 66 L.Ed. 938 (1922)). We assume there should be judicial adjudication of the issue of citizenship and a heavy criterion of proof by the government before decreeing denaturalization "unless by appropriate explicitness the lawmakers make them inapplicable." *Id.*

■ Fourth, " '[e]very tribunal, judicial or administrative, has some power to correct its own errors or otherwise appropriately to modify its judgment, decree, or

error.'" *Alberta Gas Chemicals, Ltd. v. Celanese Corp.*, 650 F.2d 9, 13 (2d Cir. 1981) (quoting 2 K. Davis, Administrative Law Treatise § 18.09 at 606 (1958)).

■ Finally, "[w]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995) (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (court must construe statute to give effect, if possible, to every provision), and *Moskal v. United States*, 498 U.S. 103, 109–111, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (same)).

## B

Examining the amended INA in light of these principles, we cannot agree with Gorbach that the absence of statutory authorization for administrative reopening and revocation is fatal, either because INA § 340(a) expressly grants denaturalization authority to the courts and INA § 342 bars administrative denaturalization, or because the "savings" clause is merely negative. While her arguments would have been compelling before the 1990 amendments, those amendments changed the legal landscape altogether.

Whereas before 1990 naturalization was determined judicially, after 1990 naturalization is determined administratively. Before 1990, naturalization orders could be reopened and revoked in the naturalization court either by a plenary action under INA § 340(a)-which is still available-or by a summary procedure under INA § 340(i). The pre–1990 summary procedure was guided by the time limits of Rule 60(b) (within one year of entry of judgment), and the bases recognized under Rule 60(b) for revisiting a final judgment (fraud, misrepresentation or other exceptional grounds). *See Magnuson*, 911 F.2d at 335 n. 11; *In re Petition of Campbell*, 326 F.2d 101, 102 (2d Cir.1964). However, the INA had never in so many words conferred on the courts the power to revoke naturalization in a summary procedure. Rather, that power was implicit, and "saved." Indeed, the savings clause was enacted for the purpose of making it clear that INA § 340(a) was *not* the exclusive route for revocation. *See Simons*, 452 F.2d at 1114. With the transfer of naturalization authority to the Attorney General, she assumed the adjudicative role previously reserved for the courts. It seems to us that the power to revoke is implicit in the authority now conferred on the Attorney General, because she has the explicit power to establish regulations necessary for carrying out her authority, and because the power to reopen and to revoke that attends the adjudicative decision to naturalize was expressly preserved by INA § 340(h). *See Balelo*, 724 F.2d at 759 (citing *Haig v. Agee*, 453 U.S. 280, 291, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (Secretary of State's power to revoke passports is implicit in broad rule-making authority conferred upon the Secretary by the Passport Act)).

We are buttressed in this view because Congress did more than just retain the "savings" provision in the 1990 amendments. It also eliminated the previous limitation on reopening a naturalization judgment to "the term of such court or within the time prescribed by the rules of procedure" which obviously applies only to a court. Agencies do not have terms and are not bound by the Federal Rules of Civil Procedure. Thus, by cutting out the proviso that applies only to a court, Congress tailored the provision that saves an adjudicator's implicit power to reopen for a non-judicial agency. Further, Congress coupled the revised savings clause with a new provision for de novo judicial review of administrative denials of naturalization. *See* 8 U.S.C. § 1421(c). In this way we believe Congress manifested its intent that the INS have power to reopen and revoke, subject to Article III review.

INA § 342 does not compel a different conclusion. Gorbach points out that § 342 confers on the Attorney General the authority to revoke certificates of naturalization issued by the INS or the Attorney General, but provides that the cancellation

of documents purporting to show citizenship status shall "affect only the document and not the citizenship status of the person in whose name the document was issued." Reno counters that § 342 pertains only to document fraud, not naturalization orders procured by fraud, and that its limitation only applies to cancellation of documents "under this section," not to the Attorney General's other powers. Literally read, this is correct. A certificate reflecting status just reflects the status already conferred; it is not the status itself. Thus, the Attorney General may only revoke a document illegally or fraudulently obtained but not the status itself as to any naturalization ordered before 1990, because the naturalization was conferred by the courts. Of course, the Attorney General's ability to determine and to deny naturalization status changed with the 1990 amendments. Even so, denials of naturalization are subject to judicial review. In particular, under Regulation 340.1, the applicant's status as a citizen is not affected until a decision to reopen the naturalization proceedings and to deny naturalization becomes final and that does not happen without the opportunity for de novo review in a United States district court. *See* 8 U.S.C. § 1421(c); 8 C.F.R. § 340.1(f), (g)(2)-(4).

Gorbach argues in the alternative that, regardless of whatever inherent power the INS may have to revisit its prior orders, that power cannot extend beyond the timely correction of "inadvertent ministerial errors" because Congress has not expressly established a formal revocation process. However, we do not read the cases upon which she bases this argument as supporting such a limitation. In *American Trucking Ass'ns v. Frisco Transp. Co.*, 358 U.S. 133, 79 S.Ct. 170, 3 L.Ed.2d 172 (1958), the Court recognized the Interstate Commerce Commission's inherent authority to correct judgments with clerical errors and judgments that were issued due to inadvertence or mistake. *See id.* at 144–46, 79 S.Ct. 170. However, this was not a limitation as Gorbach suggests but rather a description, because that is all the ICC had undertaken to do. In any event, both

*American Trucking* and *United States v. Seatrain Lines*, 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396 (1947), were concerned with proceedings that were reopened to execute new agency policy. There is no suggestion here that the INS's regulation permits reopening because of "second thoughts," or a change of policy, and nothing in either opinion casts doubt on the authority of the INS to revisit a prior order procured by fraud or concealment. Nor does *CAB v. Delta Air Lines, Inc.*, 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961), which held that the Civil Aeronautics Board lacked authority to alter a certificate of public convenience and necessity without notice or hearing and contrary to express statutory procedures. None of these defects appears on the face of the INS regulation. *Int'l Paper Co. v. FERC*, 737 F.2d 1159 (D.C.Cir.1984) and *Hirschey v. FERC*, 701 F.2d 215 (D.C.Cir.1983), are similar to *American Trucking* and *Seatrain Lines* in that each also involved an agency's authority to reopen and vacate a final order simply because the agency changed its mind. For the same reason *American Trucking* and *Seatrain Lines* aren't controlling, *Hirschey* and *Int'l Paper* are not persuasive either. Additionally, the agency in those cases did not purport to reopen on the basis of fraud; the disputed order there was "validly granted." In contrast, Regulation 340.1 permits the reopening and revoking of only those orders that are by definition not "validly granted" because they were fraudulently procured. *See Int'l Paper*, 737 F.2d at 1162; *Hirschey*, 701 F.2d at 219.

Finally, Gorbach argues that the *Minker* rule applies because neither the savings clause nor a statute granting general enforcement powers is an "appropriately explicit" grant of authority. We disagree. In *Minker* the question was whether the INS had authority under former INA § 235(a) to subpoena a naturalized citizen who was the subject of an ongoing INS investigation whose purpose was to determine if good cause existed for the institution of plenary judicial denaturalization proceedings under former § 338 of the

Act. The statute allowed for witnesses to be subpoenaed, but was ambiguous with respect to whether a putative defendant could be a "witness." In that context, the Court drew from earlier due process cases involving possible loss of citizenship to construe the ambiguity in the citizen's favor. *Minker*, 350 U.S. at 187–88, 76 S.Ct. 281 (citing *Schneiderman v. United States*, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943)) (imposing high burden of proof in plenary judicial revocation proceedings), *Baumgartner v. United States*, 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944) (same), and *Ng Fung Ho*, 259 U.S. at 284, 42 S.Ct. 492 (due process requires judicial determination of claim to citizenship). Here, in contrast with *Minker*, we are not concerned with how the agency interprets and applies its regulation. Moreover, to the extent that *Minker* presumes judicial review in the absence of appropriately explicit direction from Congress, the 1990 amendments state with "appropriate explicitness" that naturalization applications will be administratively adjudicated-subject to de novo judicial review of denials.[14]

There is nothing remarkable about recognizing an agency's power to reopen and reconsider its own decisions, especially those arguably obtained by fraud. "It is widely accepted that an agency may, on its own initiative, reconsider its interim or even its final decisions, regardless of whether the applicable statute and agency regulations expressly provide for such review." *See Dun & Bradstreet Corp. Found. v. United States Postal Serv.*, 946 F.2d 189, 193 (2d Cir.1991) (Postal Service had power sua sponte to reconsider previous decision to grant special mailing rates to non-profit organization despite absence of express statutory authority).[15] A number of courts in a variety of contexts have held that "[a]dministrative agencies have an inherent authority to reconsider their own decisions, since the power to decide in the first instance carries with it the power to reconsider." *See Trujillo v. General Elec. Co.*, 621 F.2d 1084, 1086 (10th Cir.1980) (citations omitted) (EEOC District Director has implicit power to rescind previously-issued Right to Sue notice, despite lack of statutory basis for reconsideration and recission).[16] This is so whether or not

---

**14.** Gorbach may also be suggesting that Congress could not have intended to allow authority for the INS to reopen on the basis of "credible and probative evidence" rather than some higher criterion of proof. However, we believe that is a question going primarily to the sufficiency of the process afforded-an issue not now before us. For example, the INS's instructions indicate that "evidence justifying administrative revocation should generally be clear, unequivocal, and convincing." *See* Office of the Deputy Commissioner, Implementation Guidance: INA § 340(h); 8 C.F.R. § 340.1 (Nov. 21, 1996) at 2. We do not know if this will turn out to be how the agency interprets the regulation, and we express no opinion on whether even this is a sufficiently exacting burden of proof.

**15.** *See also Gun South, Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir.1989) (despite absence of express statutory authority, BATF necessarily retained power to correct approval of firearms import licenses); *Iowa Power & Light Co. v. United States*, 712 F.2d 1292, 1294–97 (8th Cir.1983) (ICC may retroactively impose higher tariff to correct previous error).

**16.** *See also Ideal Basic Indus., Inc. v. Morton*, 542 F.2d 1364, 1367–68 (9th Cir.1976) (Secretary of the Interior has inherent authority to reconsider earlier agency decision granting application for patents on forty-five limestone mining claims); *Bookman v. United States*, 197 Ct.Cl. 108, 453 F.2d 1263, 1265 (1972) (noting "general rule that every tribunal, judicial or administrative, has some power to correct its own errors or otherwise appropriately to modify its judgment, decree or order," and stating that "where there are no statutory or administrative guidelines," a court "will sustain the reconsidered decision of an agency, as long as the administrative action is conducted within a short and reasonable time period") (citations and internal quotations omitted); *cf. Belville Mining Co. v. United States*, 999 F.2d 989, 998 (6th Cir. 1993) (affirming agency's decision to revoke a strip-mining determination and noting that "[e]ven if an agency lacks express statutory authority to reconsider an earlier decision, an agency possesses inherent authority to reconsider administrative decisions, subject to certain limitations") (citations omitted).

the applicable statute expressly provides for reconsideration. *See Gun South,* 877 F.2d at 862 (canvassing cases). And, as the Second Circuit stated, "[i]t is hard to imagine a clearer case for exercising this inherent power than when a fraud has been perpetrated on the tribunal in its initial proceeding." *See Alberta Gas,* 650 F.2d at 13 (affirming dismissal of federal court action challenging International Trade Commission decision allegedly procured by fraud before plaintiff sought reconsideration from agency itself on footing that notwithstanding absence of express statutory or regulatory authority permitting reconsideration, "a more fundamental source of authority exists for allowing the Commission to determine initially the issues in this lawsuit: the inherent power of any administrative agency to protect the integrity of its own proceedings").

Indeed, agencies regularly promulgate regulations providing for administrative reopening if it later appears that the initial decision was procured by fraud. *See, e.g.,* 20 C.F.R. §§ 404.988(c), 416.1488(c) (1998) (Social Security regulations allowing reopening "[a]t any time if . . . [the decision] was obtained by fraud or similar fault"); 20 C.F.R. § 261.2(c) (1998) (Railroad Retirement Board regulation) (same); 26 C.F.R. § 301.7121–1(c) (1998) (IRS regulation regarding tax liability "closing agreements") (same); 27 C.F.R. § 70.485(c) (1998) (BATF "closing agreements" regulation) (same); 42 C.F.R. §§ 405.841(c), 405.1885(d) (1998) (Medicare insurance carrier regulations) (same).

Against this background, it is evident that administrative reopening and revoking of the INS's prior naturalization orders is not an unintended consequence of leaving the savings clause (revised to accommodate agency practice) in place. If it were, Congress has had several opportunities to say so, but hasn't. After Regulation 340.1 was published for notice and comment, *see* Revocation of Naturalization, 59 Fed.Reg. 38,381 (proposed Jul. 28, 1994), Congress made substantial addition-

al changes to the INA without indicating that the Attorney General should not proceed to adopt the regulation. *See* the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214 (1996), and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. No. 104–208, 110 Stat. 3009 (1996), *as amended* by Act of Oct. 11, 1996, Pub.L. No. 104–302, 110 Stat. 3656 (1996). After Regulation 340.1 was implemented, *see* Revocation of Naturalization, 61 Fed.Reg. 55,550 (promulgated Oct. 28, 1996), Congress passed the Nicaraguan Adjustment and Central American Relief Act of 1997 (NACARA), Pub.L. No. 105–100, 111 Stat. 2160 (1997)-also without affecting the Attorney General's authority to reopen her orders of naturalization.

Even more significantly, in November 1997 Congress appropriated $1,657,886,000 "[f]or expenses . . . necessary for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration. . . ." *See* Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act of 1998, Pub.L. No. 105–119, 1997 U.S.C.C.A.N. (111 Stat.) 2440, 2447–48 (1997). The legislative history of the 1998 Appropriations Act indicates that Congress expressly intended $3,391,000 of these monies to be used "for revocation of citizenship for criminals improperly naturalized." *See* H.R. Conf. Rep. No. 105–405, at 105–06 (1997), *reprinted in* 1997 U.S.C.C.A.N. 2941, 2956–57 ("This statement of managers reflects the agreement of the conferees on how the funds provided in the conference report are to be spent."). As noted by the Appropriations Committee in its accompanying Report, *see* H.R.Rep. No. 105–207 (1997), these funds were to be used for the creation of 27 positions in the INS "to ensure that there are adequate resources to effect these revocations in a timely manner." *See id.* at 31 ("The Committee expects the INS to not only revoke citizenship for those ineligible persons but also to follow through with deportation

proceedings on any applicant, especially criminals, who are deportable."). Thus, "'the inference of congressional approval is supported by more than mere congressional inaction.'" *Balelo*, 724 F.2d at 761 (quoting *Haig v. Agee*, 453 U.S. at 301, 101 S.Ct. 2766 (internal quotations and citations omitted)).

For these reasons, we cannot say that Regulation 340.1 is inconsistent with the objectives of the INA, or lacks statutory authority.

### C

Lastly, Gorbach makes the related argument that the INS's claimed authority exceeds the authority previously exercised by the courts. She points out that there are differences between the INS's new administrative proceedings and court proceedings under the prior version of INA § 340(h), and that even courts were chary of using their Rule 60(b) authority to revoke naturalization, often insisting on the plenary route instead. *See Petition of Campbell*, 326 F.2d at 102; *Petition of De Roma*, 603 F.Supp. 127, 131–132 (D.N.J. 1985); *Petition of Arevalo*, 352 F.Supp. 215, 217 (D.Haw.1972); *Petition of Devlas*, 31 F.R.D. 130, 133 (S.D.N.Y.1962); *Petition of Grgas*, 133 F.Supp. 91 (S.D.Cal. 1955). *But see Petition of Cardines*, 366 F.Supp. 700, 706–08 (D.Guam 1973); *In re Bartkiw*, 199 F.Supp. 762, 765 (E.D.Pa. 1961); *Petition of Field*, 117 F.Supp. 154, 155–56 (S.D.N.Y.1953). Further, she notes that even where courts did allow the government to invoke former INA § 340(i), reopening was always subject to the strict requirements of Rule 60(b). *See Petition of Cardines*, 366 F.Supp. at 703; *Petition of Taulapapa*, 282 F.Supp. 156 (D.Haw.1968); *see also Petition of Tabilos*, 637 F.Supp. 969, 972 (N.D.Cal.1986). As a result, Gorbach urges that even if amended INA § 340(h) does allow the Attorney General to exercise the same denaturalization power previously possessed by the courts, which she does not believe it does, the statute still does not authorize the INS to bypass INA § 340(a) as it now seeks to do. She also suggests that it is inconceivable that Congress intended to permit the Attorney General to have unlimited denaturalization authority divorced from the finality concerns embedded in Rule 60(b).

We recognize that there are differences between Rule 60(b) and the procedures adopted by the INS. However, they are primarily differences of degree that do not seem to us to bear on the question of statutory authority. For example, under Regulation 340.1 the INS may reopen when it appears that an order was granted by mistake or was not known to the Service Officer during the original proceeding, whereas under Rule 60(b) the government had to show "newly discovered evidence" that could not previously have been discovered through due diligence. The INS now has two years instead of one year to seek to reopen. Under Regulation § 340.1, "credible and probative" evidence of fraud or misrepresentation of material fact justifies reopening whereas under Rule 60(b) an adverse party must adduce "clear and convincing" evidence. *See England v. Doyle*, 281 F.2d 304, 309–10 (9th Cir.1960). These are differences reasonably accounted for by differences between how an agency operates and how a court functions, and by differences in caseload. In and of themselves, they do not appear inconsistent with the statutory scheme. Beyond this, to the extent that Gorbach anticipates that these procedures or others will be problematic as applied, that is something not before us on this appeal which she can challenge in due course. *See Pence v. Andrus*, 586 F.2d 733, 737–38 (9th Cir. 1978).

### CONCLUSION

In sum, when the courts had the power to naturalize they could revisit naturalization decisions either through a process invoked pursuant to statute by a United States Attorney, or initiated pursuant to their inherent power to reopen and vacate their own orders (cabined as a practical matter by Fed. R. Civ. Proc. 60(b)). This latter power was not *conferred* by statute,

but was expressly *preserved* by statute. In so doing, Congress limited the courts' inherent power to reopen their own orders when acting as a naturalization court by the term of court, and the time prescribed by the rules of that court, for jurisdiction to take such action. Once the power to naturalize was transferred to the Attorney General, the courts lost their residual power to reopen a naturalization order because they may no longer enter one. The power to reopen necessarily follows from the power to grant. Congress acknowledged this in the 1990 INA amendments by retaining that part of the "savings" clause which preserved the courts' power to reopen their own orders, yet repealing that part of the clause which tied reopening to court rules and term-a constraint that makes sense for courts but no sense for an agency. For this clause to mean anything at all, Congress must have assumed that the Attorney General would necessarily have the power to reopen and to vacate her own orders of naturalization. We do not have to decide the extent of that power as applied to hold that it exists as a matter of authority.

While the Attorney General may reopen (in order to reconsider and possibly to revoke) her orders of naturalization, courts retain the power to revoke naturalization at the instigation of United States Attorneys. This power is no more superfluous if the INS may reopen its own decisions than it was when the courts could reopen theirs. In each case, the triggers are different. Regardless, the conditions under which the regulation permits reopening do not depart so radically on their face from those that allowed courts to reopen as to suggest that reopening is not statutorily authorized. In addition, when applications for naturalization are denied-as they are in effect when the INS reopens and revokes-courts have the additional power under the 1990 amendments and the regulation to review the applications de novo. Thus, at the end of the day, whether naturalization is administratively denied in the first instance, or granted and then denied upon reopening, a federal court has the final say.

VACATED.

KLEINFELD, Circuit Judge, dissenting:

I respectfully dissent from Part IV of the opinion, which holds that the attorney general has statutory authority to denaturalize American citizens who attained citizenship by naturalization. As the majority concedes, Congress did not expressly confer that authority on the attorney general. Because the power to denaturalize is so important, and because it differs as a practical matter from the power to naturalize, I do not think we should infer its existence from delegation of the power to naturalize.

The delegation Congress expressly made to the attorney general was of "authority to naturalize" citizens.[1] Congress expressly delegated to the attorney general only the power to cancel "certificates of citizenship," expressly providing that such cancellations "shall affect only the document and not the citizenship status."[2] The express statutory procedure for denaturalization says that United States attorneys are supposed to bring proceedings "in any district court."[3] Thus the express scheme plainly and unambiguously gives the attorney general the power to naturalize citizens and to cancel certificates of citizenship but not the citizenship itself, and gives to district courts the power to denaturalize citizens.

The only express provision from which the attorney general infers a power to denaturalize is a saving clause: "Nothing contained in this section shall be regarded as limiting, denying, or restricting the power of the Attorney General to correct, reopen, alter, modify or vacate an order naturalizing the person."[4] A saving

1. 8 U.S.C. § 1421(a).

2. 8 U.S.C. § 1453.

3. 8 U.S.C. § 1451(a).

4. 8 U.S.C. § 1451(h).

clause does not create anything; it merely preserves what is already there from repeal. This saving clause tells us not to infer a negative pregnant eliminating some power the attorney general has from the other provisions in the denaturalization statute. But absence of implied repeal does not amount to creation of some new power. Under the saving clause, what authority the attorney general has, she keeps, but it does not give her more.

The heart of the attorney general's argument is that the power to denaturalize is inherent in the power to naturalize. I do not see why that should be so. There is no general principle that what one can do, one can undo. It sounds good, like the Beatles' lyrics "Nothing you can know that isn't known/ Nothing you can see that isn't shown/ Nowhere you can be that isn't where you're meant to be," but like those lyrics, "it ain't necessarily so." Even federal courts depend on an express and circumscribed grant of authority, approved by Congress, for their power to vacate their own decisions.[5] If the power of courts to vacate their own judgments depends on an express rule approved by Congress, I do not see why an analogous power in the attorney general should be inferred from Congressional silence. The formula that what one can do, one can undo, is sometimes true, sometimes not. A person can give a gift, but cannot take it back. People can without court intervention marry, but not unmarry. A jury can acquit, and a judge render judgment on the verdict, but they cannot undo it and convict. Whether the attorney general can undo what she has the power to do, naturalize citizens, depends on whether Congress said she could.

If practicality required that the power to undo naturalizations reside in the same agency as the power to naturalize, then we might infer that Congress intended to give that power to the attorney general. The inference would rest on the implicit principle that Congress is presumed to do what makes sense. But there is no practical sense in supposing that because the attorney general can naturalize, she needs to have the power to denaturalize. The former power is typically exercised wholesale, the latter retail. An administrative agency is useful for performing large numbers of repetitive routine (from the agency's viewpoint, not the new citizen's) tasks that do not take away important liberties from individuals, such as naturalizations. But administrative agencies, accustomed to treating a case as " 'one unit in a mass of related cases,' "[6] are dubious instruments for performing relatively rare acts catastrophic to the interests of the individuals on whom they are performed.

If the attorney general errs at a high rate in the high volume business of naturalizations, Congress might sensibly delegate naturalization power to her because the courts could not handle the volume and the errors were bearable, but conclude that the courts ought to handle denaturalizations, because there are fewer of them and they affect individual liberty too severely to tolerate a high error rate. The attorney general's own auditors reported that the INS made at least one processing error in nine out of ten of the denaturalization cases sampled. "In 90.8% of the cases reviewed, INS and KPMG found that INS had made at least one processing error, with an average of two errors per case."[7] While many or most errors might not lead to an erroneous result, the audit reported that 3.7% of the naturalizations were erroneous in result.[8] The Justice Department is now seeking to revoke the naturalizations it performed on 369 of the 1,049,867

---

5. Federal Rule of Civil Procedure 60.

6. *Castillo–Villagra v. I.N.S.*, 972 F.2d 1017, 1026 (9th Cir.1992), quoting Walter Gellhorn, Official Notice in Administrative Adjudication, 20 Tex.L.Rev. 131, 136 (1941).

7. Department of Justice Press Release at 3, in Excerpts of Record, introducing KPMG Peat Marwick final audit of naturalizations of 1,049,867 individuals from · August 1995 through September 1996.

8. *Id.* at 4.

people it naturalized from August 1995 through September 1996, and is reviewing another 5,954 for possible denaturalization proceedings.[9]

These numbers vitiate any argument that Congress must have intended to give the attorney general the power to denaturalize, as a matter of practicality, when it gave her the power to naturalize. The federal judiciary could not have processed a million extra cases, even routine ones, in twelve months, but there is no reason to doubt that it can handle the few hundred, or at most a few thousand, denaturalizations that result from high volume, high error rate naturalizations. It is at least as reasonable to think that Congress would delegate the power to naturalize in an administrative agency, and the power to denaturalize in district courts, based on the numbers of cases and the relative risks to individual liberty in the two kinds of cases, as it is to think that it intended to lodge both powers in the administrative agency.

Historically, Congress and the Supreme Court have been sensitive to the risk that the naturalization power might be improperly politicized. Indeed, the Declaration of Independence criticized the King of England for improperly politicizing naturalization: "HE has endeavored to prevent the Population of these States; for that Purpose obstructing the Laws for Naturalization of Foreigners...." The Supreme Court has, partly for that reason, construed the denaturalization statutes in such a way as to avoid delegation except to federal courts, except where an alternative delegation was clearly and unambiguously expressed. The Court said in *Bindczyck v. Finucane*[10] that "elections could be influenced by irregular denaturalizations as well as by fraudulent naturalizations." The Court gave the example, from a century ago, of how a "judge who had natural-ized seven aliens on the supposition that they were members of his own political party promptly vacated his order when this supposition was corrected."[11] This risk of politicization of denaturalization was among the reasons why the Court in *Bindczyck* refused to infer the power to denaturalize from the power to naturalize.

*Bindczyck* is critical to resolution of this case. Under the statute then in effect, state courts had the power to naturalize citizens, and the question was whether they therefore had the power to denaturalize, by vacating their own orders of naturalization when procured by fraud. This question is analogous to the issue before us: does the power to naturalize carry with it an inherent power to denaturalize. The answer was (and is): No. The Court in *Bindczyck* said that despite their power to naturalize, the state courts did not have power to denaturalize. The Court rejected the argument that a court's inherent power to vacate its own judgments included a power to denaturalize. It held that the statute giving the attorney general the duty to institute denaturalization proceedings[12] in certain designated courts was "a carefully safeguarded method for denaturalization"[13] and that the government's statutory right to appear at any naturalization and the power of district courts to revoke naturalizations "provided a complete and exclusive framework for safeguarding citizenship against unqualified applicants."[14]

*Bindczyck* forcefully rejects the argument (analogous to the one today's majority accepts) that (1) grant of citizenship is a judgment; (2) an issuing court may revoke its own judgments for fraud; so (3) a state court that granted a judgment of naturalization may vacate its own judgment for fraud. The Court calls this "mechanical jurisprudence in its most glittering form"

9. *Id.* at 1–2.

10. *Bindczyck v. Finucane*, 342 U.S. 76, 82, 72 S.Ct. 130, 96 L.Ed. 100 (1951).

11. *Id.* at 82–83, 72 S.Ct. 130.

12. The predeccessor to 8 U.S.C. § 1451(a).

13. *Bindczyck v. Finucane*, 342 U.S. 76, 81, 72 S.Ct. 130, 96 L.Ed. 100 (1951).

14. *Id.* at 84, 72 S.Ct. 130.

that "disregards the capricious and haphazard results that would flow from applying such an empty syllogism to the actualities of judicial administration." [15]

Congress abrogated the result in *Bindczyck* by expressly conferring on state courts the power to revoke naturalizations they had granted. The majority notes a Second Circuit case that had said *Bindczyck* was "overruled" by the statutory change,[16] but obviously Congress cannot "overrule" Supreme Court decisions. What Congress did was to change the statute that *Bindczyck* had construed so that it no longer said or meant what it had when *Bindczyck* had construed it. The Supreme Court in *United States v. Zucca* [17] expressly repudiated the notion that *Bindczyck* was overruled or rendered irrelevant by the statutory amendment, by declaring that "[t]he underlying philosophy of *Bindczyck* remains intact" despite the specific holding about state courts that was "abrogated" by the statutory change.[18]

That philosophy emphasizes the importance of citizenship and the safeguards against taking it away. In *Zucca,* where the denaturalization statute had prescribed how United States attorneys should file a case (with an affidavit), the Court held that they could not also proceed in the usual way (without an affidavit).[19] The "underlying philosophy of *Bindczyck* " that *Zucca* says "remains intact" is "safeguarding citizenship from abrogation except by a clearly defined procedure," [20] "clearly defined," that is, by statute. *Zucca* applied the *Bindczyck* holding that the statutory denaturalization procedure was "a self-contained, exclusive procedure" that "covers the whole ground." [21] That means, for this case, that the denaturalization procedure defined in 8 U.S.C. § 1451(a) is "exclusive" and "covers the whole ground."

In *United States v. Minker* [22] the Court said that denaturalization "may result in loss of both property and life; or of all that makes life worth living." [23] *Minker* adopts the rule that "where there is doubt it must be resolved in the citizen's favor." [24] This holding, as applied to the case at bar, means that if there is doubt whether the statute confers the power on the attorney general to denaturalize, or leaves it exclusively in the district courts, the doubt must be resolved against the attorney general. The best we can say of the attorney general's proposed inference of a delegation of power from a saving clause in the case at bar is that it leaves some doubt, so the doubt "must be resolved in the citizen's favor" under *Minker.* Any question whether that applies to administrative agencies is answered by *Minker*'s next sentence: "Especially must we be sensitive to the citizen's rights where the proceeding is nonjudicial, because of '[t]he difference in security of judicial over administrative action....' " [25]

All these principles of construction— that the statutory denaturalization procedure exhausts the field, that the power to denaturalize does not imply a power to denaturalize, that doubts are to be resolved in the naturalized citizen's favor, and that administrative action is to be deemed less secure than judicial—remain the law. The 1990 statutory amendments

---

**15.** *Id.* at 85, 72 S.Ct. 130.

**16.** *Simons v. United States,* 452 F.2d 1110, 1114 (2d Cir.1971).

**17.** *United States v. Zucca,* 351 U.S. 91, 76 S.Ct. 671, 100 L.Ed. 964 (1956).

**18.** *Id.* at 95 n. 8, 76 S.Ct. 671.

**19.** The predecessor to 8 U.S.C. § 1451(a).

**20.** *Zucca,* 351 U.S. at 95, 76 S.Ct. 671.

**21.** *Id.* at 99, 76 S.Ct. 671 (quoting *Bindczyck,* 342 U.S. at 83–84, 72 S.Ct. 130).

**22.** *United States v. Minker,* 350 U.S. 179, 76 S.Ct. 281, 100 L.Ed. 185 (1956).

**23.** *Id.* at 187, 76 S.Ct. 281 (quoting *Ng Fung Ho v. White,* 259 U.S. 276, 284, 42 S.Ct. 492, 66 L.Ed. 938 (1922)).

**24.** *Minker,* 350 U.S. at 188, 76 S.Ct. 281.

**25.** *Id.* (quoting *Ng Fung Ho,* 259 U.S. at 285, 42 S.Ct. 492).

shifted the power to naturalize citizens from federal and state courts to the attorney general, but left intact the district court denaturalization proceeding.[26] The amendments also changed the saving clause, from one that saved to state and federal courts whatever power they had to vacate their own judgments with respect to naturalizations, to a new version that saved to the attorney general whatever power she had.[27] This change in the saving clause is insufficient to accomplish a delegation, in the face of the holdings in *Bindczyck, Zucca,* and *Minker.*

I concede that an alternative construction, like the majority's, is plausible from the words of the statute, if the statute is read without the gloss provided by the controlling Supreme Court decisions. One could reason that Congress would not have written a saving clause if there were nothing to save. But this inference from silence is not enough, under the Supreme Court cases holding that the express statutory procedure is exclusive and fully occupies the field, to imply a delegation. Nor can it necessarily be said that the alternative is to construe the saving clause as having no meaning. Possibly the agency has authority to correct clerical errors shortly after they are made, which authority the saving clause preserves, and certainly it has the other powers described in the saving clause, such as to reopen and correct naturalizations for errors such as misspelled and misdesignated names. Were we to infer a negative pregnant, we might do so more readily from the limitation on the attorney general's power regarding cancellation of a certificate of citizenship. Congress provided that the attorney general can cancel a certificate fraudulently obtained, but the cancellation "shall affect only the document and not the citizenship status of the person in whose name the document was issued."[28] It is hard to see why Congress would limit cancellations in this way, unless the statutory procedure for denaturalization in federal district courts remains the exclusive means of revoking the citizenship of an individual who has been naturalized. The most Congress gave the attorney general regarding the power to denaturalize is silence, and "[n]ow and then silence is not pregnant."[29]

The attorney general not only grabbed the ball on denaturalizations, but ran out of bounds with it. The regulation reverses the ordinary burden of proof. The regulation not only says that the Immigration and Naturalization Service may revoke a naturalization.[30] It goes so far as to say that the naturalized citizen "bears the burden of persuading the district director that, notwithstanding the evidence described in the notice, the applicant was eligible for naturalization...."[31] An administrative appeal is allowed[32] as well as judicial review.[33] Although such review is *de novo*[34] rather than for substantial evidence on the record as a whole, there is no express provision shifting the burden of proof back to the administrative agency, and of course nothing to relieve the naturalized citizen of the expense of fighting denaturalization three times instead of once, through two layers of administrative agency proceedings before getting to court. Taking over denaturalization proceedings, shifting the burden of proof from the government to the citizen, and imposing two layers of administrative proceedings before the naturalized citizen can get to court, is all quite a lot of power to infer from silence. Unless Congress changes

---

**26.** 8 U.S.C. §§ 1421(a), 1451(a).

**27.** 8 U.S.C. § 1451(h).

**28.** 8 U.S.C. § 1453.

**29.** *El Paso Natural Gas Co. v. Neztsosie,* ——— U.S. ———, ———, 119 S.Ct. 1430, 1439, 143 L.Ed.2d 635 (1999).

**30.** 8 C.F.R. § 340.1(a).

**31.** 8 C.F.R. § 340.1(b)(6).

**32.** 8 C.F.R. § 340.1(e).

**33.** 8 C.F.R. § 340.1(f).

**34.** 8 U.S.C. § 1421(c).

the statute or the Supreme Court changes the rules of construction, I do not think we can sustain the attorney general's claim of authority, in the face of the express statutory procedure for denaturalizations to be prosecuted in federal district courts, and the absence of any express grant of authority to the attorney general.